680 P.2d 1383

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Gregory Ryan CURTIS, Defendant-Appellant.**

No. 13859.

Court of Appeals of Idaho.

March 30, 1984.

Frederick G. Loats, Coeur d'Alene, and John F. Croner, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., by Lynn E. Thomas, Sol. Gen., and Timothy M. Walton, Deputy Atty. Gen., of Boise, for plaintiff-respondent.

BURNETT, Judge.

After drinking alcoholic beverages, Gregory Ryan Curtis drove an automobile upon a public highway. He collided head-on with another vehicle. The impact killed a woman passenger in the other car. Curtis now stands convicted of involuntary manslaughter. On appeal he contends that he was prosecuted under a defective statute and that the evidence of a blood alcohol test was improperly admitted at trial. We reject both contentions and affirm the judgment of conviction.

I

We turn first to Curtis' attack upon the manslaughter statute, I.C. § 18–4006.[1] The statute, as it existed when this case arose, defined involuntary manslaughter to include the killing of another human being without malice, while operating a motor vehicle, "[i]n the commission of an unlawful act, not amounting to a felony" or "[i]n the commission of a lawful act which might produce death, in an unlawful manner." Each of these acts was further classified as to whether it was accompanied by gross negligence. If a proscribed act were committed "with gross negligence," it would be punishable as a felony under a companion statute, I.C. § 18–4007. If the act were committed "without gross negligence," it would be punishable only by the lesser penalties ascribed to an "indictable misdemeanor." *State v. Long*, 91 Idaho 436, 441, 423 P.2d 858, 863 (1967).

**1.** This statute, which has antecedents tracing to the year 1864, was most recently amended in 1965 and 1983. *See* 1965 Idaho Sess.Laws ch. 136, § 2, p. 268, *and* 1983 Idaho Sess.Laws (Ex. Sess.) ch. 3, § 17, p. 21. The 1965 version, pertinent here, provides in full text as follows:

Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds:
1. Voluntary—upon a sudden quarrel or heat of passion.
2. Involuntary—in the perpetration of or attempt to perpetrate any unlawful act, other than arson, rape, robbery, kidnapping, burglary, or mayhem; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; or in the operation of any firearm or deadly weapon in a reckless, careless or negligent manner which produces death; or in the operation of a motor vehicle:

(a) In the commission of an unlawful act, not amounting to a felony, with gross negligence; or,
(b) In the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence; or,
(c) In the commission of an unlawful act, not amounting to a felony, without gross negligence; or,
(d) In the commission of a lawful act which might produce death, in an unlawful manner, but without gross negligence.
Provided, this provision relating to operation of a motor vehicle shall not be construed as making any homicide in the driving of a vehicle punishable as involuntary manslaughter which is not a proximate result of the commission of an unlawful act, not amounting to a felony, or of the commission of a lawful act which might produce death in an unlawful manner.

Curtis' challenge to § 18–4006 is a narrow one. He argues that insofar as the statute proscribes conduct without gross negligence, it is of doubtful meaning. This contention is grounded upon decisions of our Supreme Court holding that the term "criminal negligence"—as used in another statute, I.C. § 18–114—means gross negligence.[2] *State v. Hintz*, 61 Idaho 411, 102 P.2d 639 (1940); *State v. McMahan*, 57 Idaho 240, 65 P.2d 156 (1937). Curtis urges that these decisions leave no room for § 18–4006 to prohibit anything less than gross negligence, thus creating doubt as to what conduct is covered by those provisions of § 18–4006 which refer to acts "without gross negligence." This argument has both constitutional and statutory dimensions.

**A**

Curtis' constitutional attack upon § 18–4006 invokes the due process provisions of the fourteenth amendment to the United States Constitution and of art. I, § 13, in the Idaho Constitution. Due process requires a criminal statute to give fair warning of the conduct prohibited, so that affected persons may conform their conduct to the requirements of the law. *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *State v. Lopez*, 98 Idaho 581, 590, 570 P.2d 259, 268 (1977). However, a criminal defendant suffers no deprivation of due process unless the challenged statute is applied to his disadvantage. *E.g., State v. Wendler*, 83 Idaho 213, 360 P.2d 697 (1961) (constitutional challenge to "off-highway" application of negligent homicide statute not considered when defendant was convicted of the offense while on the highway). *See also Sullivan v. Sullivan*, 102 Idaho 737, 739 n. 5, 639 P.2d 435, 437 n. 5 (1981). There must be a connection between the challenged provisions of a statute and the litigation in question before we are required to consider the statute's constitutionality. *Boode v. Allied*

*Mutual Insurance Co.*, 458 P.2d 653 (Wyo. 1969).

In this case, no such connection has been demonstrated. Curtis was not charged with, nor was he convicted of, conduct lacking gross negligence. Rather, the prosecutor's information charged Curtis with gross negligence, the jury that convicted him was instructed on gross negligence, and the verdict recited a finding of gross negligence. Curtis does not now contend that such a finding lacked support in the record. Indeed, we believe the finding was adequately supported by testimony that Curtis had been drinking and by evidence from which it could be inferred that Curtis' vehicle had crossed the centerline of the highway. Accordingly, we hold that Curtis has not shown that his right to due process was infringed by any vagueness ascribed to the provisions of § 18–4006, relating to conduct without gross negligence.

**B**

Curtis' underlying statutory claim—that the meaning of § 18–4006 is clouded by § 18–114—could be similarly rejected for lack of germaneness to this case. But we deem it important to explain that the contention also is defective on its merits. In *State v. Long, supra*, our Supreme Court examined § 18–4006 in light of the construction earlier placed upon the phrase "criminal negligence" in § 18–114 by *Hintz* and *McMahan*. The Court in *Long* noted that § 18–4006 subsequently had been amended, in 1965, to create a separate category of involuntary manslaughter involving the use of a motor vehicle. As to that type of manslaughter—and that type only—the Legislature established criminal responsibility for conduct "without gross negligence" and prescribed a level of punishment less severe than that authorized for felonies. The Court in *Long* declared that the Legislature thereby evinced an intent to change the law existing before

---

**2.** Idaho Code § 18–114, like § 18–4006, is of ancient vintage. It has remained virtually intact since its original enactment in 1864. It

provides that "[i]n every crime or public offense there must exist a union, or joint operation, of act and intent, or criminal negligence."

1965, upon which *Hintz* and *McMahan* had been based. The Court implicitly held that vehicular involuntary manslaughter under § 18–4006 was not subject to the restrictive interpretation of "criminal negligence" in § 18–114.

We find no reason to depart from *Long*. We agree with the Supreme Court that the Legislature was free in 1965 to create a separate, lesser category of crime for vehicular homicides lacking gross negligence. Many other states previously had enacted such laws; indeed, the courts of some jurisdictions specifically had interpreted phrases such as "criminal negligence" to allow imposition of criminal penalties for acts unaccompanied by gross negligence. *See* Annot., 161 A.L.R. 10 (1946). We hold that the conduct prohibited by § 18–4006 is not made doubtful by the interpretive gloss placed upon § 18–114. We sustain the validity of § 18–4006 as applied to this case.[3]

## II

We next consider whether the district court erred by admitting the results of a blood alcohol test. That test, conducted at a hospital, showed Curtis to have a blood alcohol content of .198%—more than twice the then-existing level of presumptive intoxication. *See* I.C. § 49–1102 (as amended, 1974 Idaho Sess.Laws ch. 27, § 141, p. 938). Curtis contends that he submitted to the test only because he was coerced. He mounts a two-pronged attack upon admission of the evidence, claiming that his constitutional rights were violated and that the Idaho "implied consent" statute was violated. We examine each argument in turn.

**3.** In *Long* the Supreme Court also held that certain language employed by § 18–4006—such as the phrase "commission of a lawful act ... in an unlawful manner"—could be understood by the average citizen and therefore was not void for vagueness. That holding is not challenged in this case.

**4.** In *State v. Bock, supra,* the Idaho Supreme Court held that neither the fourth amendment nor the search and seizure provision of the Idaho Constitution, art. I, § 17, was implicated

## A

There is no general, constitutional right to refuse a blood alcohol test. *State v. Turner,* 94 Idaho 548, 494 P.2d 146 (1972). Such a test—which produces real, rather than testimonial or communicative, evidence—does not infringe upon any privilege against self-incrimination. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *State v. Bock,* 80 Idaho 296, 328 P.2d 1065 (1958). Neither does a blood test, unless performed with inappropriate force, offend any basic values of fairness underlying the constitutional guaranty of due process. *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). However, the administration of a blood alcohol test is a seizure of the person, and a search of his body for evidence, within the fourth amendment to the United States Constitution. *Schmerber v. California, supra.* The fourth amendment applies to the states through the fourteenth amendment. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).[4]

The blood test in this case was administered without a search warrant. A warrantless search or seizure is unreasonable *per se,* and invokes the exclusionary rule under the fourth amendment, unless it falls within a recognized exception to the warrant requirement. In *State v. Harwood,* 94 Idaho 615, 495 P.2d 160 (1972), our Supreme Court identified such an exception for a search, with probable cause, made necessary by impending loss or destruction of the evidence. The United States Supreme Court in *Schmerber,* upholding administration of a blood test over a nonconsenting defendant's fourth amend-

by a blood test. That holding, as to the fourth amendment, has been rendered obsolete by *Schmerber;* and we similarly disapprove it as to art. I, § 17. We believe the Idaho Constitution provides no lesser protection from unreasonable searches and seizures than does the federal constitution. However, we are not called upon in this case to determine whether art. I, § 17, affords *greater* protection. Accordingly, we confine our constitutional analysis here to the fourth amendment.

ment challenge, specifically noted that exigent circumstances may exist for blood alcohol tests. The constraints of time due to natural destruction of the evidence, as alcohol is eliminated from the human body, make a warrantless blood test reasonable and appropriate. *State v. Turner, supra.*

The *Schmerber* court further acknowledged the requirement enunciated in *Harwood,* that a warrantless search in exigent circumstances must be supported by probable cause. In *Schmerber* the defendant had been arrested for drunk driving. The Supreme Court held that facts establishing reasonable cause for the arrest also suggested the likely positive result of a blood test, and satisfied the requirement of probable cause for the search. In the present case, Curtis had not been arrested before the test was administered; but reasonable cause for such an arrest existed. When the police arrived at the scene of the fatal collision, an officer noted both full and empty beer cans in Curtis' car. When the officer talked to Curtis in an ambulance, he smelled a strong alcoholic odor on Curtis' breath. Such facts would suffice to establish reasonable cause to arrest for driving while intoxicated, and they furnish probable cause to conduct a blood alcohol test. *State v. Cutler,* 94 Idaho 295, 486 P.2d 1008 (1971). The fact that an arrest was not actually made before the test does not detract from the existence of probable cause. It is the existence of probable cause for the search, not the fact of arrest, which is constitutionally significant. We conclude that the blood alcohol test did not violate Curtis' fourth amendment rights. The district court committed no constitutional error by admitting the result of the test into evidence.

B

Curtis also contends that the blood test was administered in violation of his statutory right of refusal under I.C. § 49–352— the "implied consent" law. At times pertinent to this case, the statute provided as follows:

Any person who operates a motor vehicle or motorcycle in this state shall be deemed to have given his consent to a chemical test of his breath, blood, urine or saliva for the purpose of determining the alcoholic content of his blood, provided that such test is administered at the direction of a police officer having reasonable gounds [grounds] to believe such person to have been driving in an intoxicated condition and in accordance with the rules and regulations established by the police force of which he is a member. *If such person having been placed under arrest and having thereafter been requested to submit to such chemical test refuses to submit to such chemical test the test shall not be given but the director shall suspend his license ... for a period of ninety (90) days....* [Emphasis added.]

Section 49–352 creates a statutory right—where no constitutional right exists—to refuse the test. A defendant's "implied consent" to the test is revoked if he expressly declines to take it. *State v. Bock, supra.* Of course, if a defendant exercises his right to refuse, after being arrested, his driving privileges may be suspended. Moreover, regardless of arrest, the fact of refusal may be used in evidence against him. *Id. See also South Dakota v. Neville,* 456 U.S. 971, 102 S.Ct. 2232, 72 L.Ed.2d 844 (1982). These consequences are the price of refusal.

However, in the present case, the district court admitted the result of the blood test upon a finding that Curtis, in fact, had not refused. This finding is challenged on appeal. Because the finding relates to the exercise of a statutory right, it is not subject to the appellate standard of review for waiver of a constitutional right. That standard would require us to make an independent determination of whether a waiver was voluntary. *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *State v. Huskey,* 106 Idaho 91, 675 P.2d 351 (Ct.App.1984). Rather, we believe a finding as to whether a person has refused a blood test should be

reviewed under the more restrained standard of clear error customarily applied to factual issues. *Cf. State v. Moulds,* 105 Idaho 880, 673 P.2d 1074 (Ct.App.1983) (standard of clear error applies to an essentially factual determination which does not impinge directly upon a fundamental right).

Under this standard, a factual finding will not be deemed clearly erroneous unless, after reviewing the record, an appellate court is left with a definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We will defer to the finding below if it is supported by substantial and competent, though conflicting, evidence. In this case the district court made its finding, that Curtis had not refused the test, upon evidence adduced at a suppression hearing. Three people testified at the hearing: Curtis, his father, and the investigating police officer.

The officer testified that he first requested a blood test from Curtis approximately an hour and one-half following the collision. He read § 49–352 aloud to Curtis. At that time, Curtis was awaiting treatment in the hospital. He was conscious and alert. His father had arrived and was at Curtis' side. After initially refusing, and saying he felt the result "would be against him," Curtis ultimately agreed to the test upon being informed that the driver of the other car also would be tested. (The test of the other driver yielded blood alcohol content less than .01%.) Curtis signed a written consent form and took the test. While signing the form is not conclusive, it is strong evidence that Curtis did not take the test under coercion.

The testimony of Curtis and his father was similar to that of the officer on many points. Curtis stated that when the officer first requested a blood sample, he refused.

He recalled that the officer read the statute. He told the officer that he understood the law, but still he refused to give any blood. He testified that he did not say he feared an adverse result on the test. He further testified that he later changed his mind and consented only because the officer told him he had no choice, ordering him to take the test and assuring him that he had been "in the right" in the accident. In addition, his father had counselled him "to cooperate." Curtis' testimony conflicted with that of the officer, who denied assuring Curtis that he had been in the right. The officer testified that he told Curtis he was not then able to determine who was at fault.

The district judge, in finding that Curtis had not refused the test, implicitly gave credence to the police officer's testimony. He noted that Curtis had signed the consent form. The court also discredited Curtis' assertion that he believed he had no choice, because it was undisputed that the statute—which plainly sets forth the choice—had been read and understood. Upon this record we are not left with a firm or definite conviction that the judge's finding was mistaken. It is supported by substantial evidence. Accordingly, we hold that the finding is not clearly erroneous.[5] It will not be disturbed on appeal. We conclude that the court properly admitted the result of the blood alcohol test into evidence.

The judgment of conviction is affirmed.

WALTERS, C.J., and SWANSTROM, J., concur.

---

**5.** Because we uphold a finding that Curtis did not refuse the blood test, we need not decide in this case whether § 49–352 embraces an exclusionary rule barring admission of the result of a blood test administered despite a refusal.