783 P.2d 859

**STATE of Idaho, Plaintiff-respondent,**

v.

**David Jon KYSAR,
Defendant-appellant.**

No. 17220.

Supreme Court of Idaho.

Nov. 21, 1989.

Radin & Webb, Idaho Falls, for defendant-appellant. John L. Radin argued.

Jim Jones, Atty. Gen., Boise, Michael A. Henderson, Deputy Atty. Gen., Boise, for plaintiff-respondent. Michael A. Henderson argued.

BAKES, Chief Justice.

Defendant David Kysar entered a conditional plea of guilty to a charge of robbery pursuant to I.C.R. 11(a)(2), reserving the right to review certain adverse pretrial rulings. Kysar appeals the trial court's denial of separate motions to suppress evidence and to dismiss the information for failure to hold a speedy trial. Kysar also appeals his sentence. We affirm.

## I

### SUPPRESSION OF EVIDENCE

First we address Kysar's appeal of the trial court's denial of his motion to suppress evidence. Kysar asserts that the police had no probable cause to arrest him, that the arrest and interrogation were illegal and that any evidence obtained from

him should be suppressed. Kysar also argues that a "show up" conducted prior to the arrest was impermissibly suggestive and that any identification testimony and evidence stemming from it should be suppressed. Finally, Kysar challenges the use of all written and oral statements made by him after his arrest on the grounds that they were taken in violation of the *Miranda* rule, and that he did not voluntarily and knowingly make those statements.

### A.

#### *Probable Cause*

We first address Kysar's claim that the police had no probable cause to arrest him. A peace officer may make a warrantless arrest when a felony has been committed and "he has reasonable cause for believing the person arrested to have committed it." I.C. § 19–603. Reasonable or probable cause for an arrest exists where the officer possesses information that would lead a person of ordinary care and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty. *State v. Alger*, 100 Idaho 675, 603 P.2d 1009 (1979); *State v. Cook*, 106 Idaho 209, 677 P.2d 522 (Ct.App.1984). In evaluating a police officer's determination of probable cause in the field, a court must take into account "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949); *State v. Alger*, 100 Idaho 675, 677, 603 P.2d 1009, 1011 (1979); *State v. Cook*, 106 Idaho 209, 215, 677 P.2d 522, 528 (Ct.App.1984). In determining whether there is probable cause for an arrest, an officer is entitled to draw reasonable inferences from the available information in light of the knowledge that he has gained from his previous experience and training. *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

We conclude that the record contains sufficient evidence to support the trial court's finding that the police officers had reasonable cause to arrest the defendant. Shortly before 9:30 p.m. on February 4, 1987, two individuals wielding knives robbed a Pizza Hut restaurant in Idaho Falls. They took between $558 and $609. The robbers' faces were covered. Only three Pizza Hut employees were present, one of whom apparently was able to report the robbery while it was in progress. Officer Kevan Vanleuven responded to the report and arrived at the Pizza Hut within a minute after the robbers had fled the scene. Officer Vanleuven was told at the scene that the two robbers had fled northeast on foot in the direction of Hansen Avenue and climbed over a fence at the north end of the parking lot. Officer Vanleuven then radioed a hurried description of the robbers given by Bob Rudolph, one of the employees. The report provided the following details: two individuals on foot, both wearing Levi's and white tennis shoes, one wearing a green Army fatigue-type jacket with a U.S. Army patch on the front pocket, the other wearing a dark hooded jacket. Shortly after Officer Vanleuven radioed his report, the dispatcher radioed a citizen's report of persons running on Hansen Avenue, getting into a small yellow Honda, and speeding down Raymond Drive. (Hansen Avenue runs north from the Pizza Hut and comes to a finish at Raymond Drive after curving slightly to the east. The section of Raymond Drive which the car sped down curves southeast, finishing at Skyline Drive which runs north-south.)

Officer Brent Guymon heard the radio reports and drove west along Pancheri Drive toward the scene of the crime in order to close off a possible escape route (Skyline Drive). As he approached Skyline Drive, Officer Guymon spotted a small yellow "Honda looking" car (actually, a Ford Fiesta) with two persons inside. The car was turning quickly left (east) onto Pancheri Drive. His observation came 3 or 3½ minutes after the initial robbery report. Officer Guymon testified that it would take between 2 and 3 minutes to drive from the Pizza Hut to the intersection at Pancheri Drive and Skyline Drive. After the small yellow car passed him, Officer Guymon turned around and followed, eventually ending up in an alleyway near a residence.

After coming to a stop in the alleyway, David Kysar and his twin brother Dale got out of the yellow Fiesta. Officer Guymon then detained them for an investigation. Both wore Levi's and white tennis shoes. Dale wore a green Army fatigue-type jacket with a U.S. Army patch on the pocket. David wore a black T-shirt with no sleeves. Sgt. James Codding, who backed up Officer Guymon, testified that it was very cold that night (February 4, 1987).

While Officer Guymon may have possessed sufficient information at that point to strongly suspect the Kysars' guilt, he did not arrest them until after they had been positively identified by two Pizza Hut employees in a "show up" conducted outside the apartment. Shortly after the detention began, Officer Vanleuven brought the employees, Rudolph and Dorae Burdick, to the scene. With their faces covered by jackets, the Kysars were placed within five or six feet of the eyewitnesses. Burdick identified Dale as being one robber, based on his green Army fatigue-type jacket. Rudolph said the suspects were of the same build as the robbers and that David tied the black shoelaces in his white tennis shoes the same unique way as the robber. Sgt. Codding then arrested the two Kysar brothers. Based upon this identification, which we find was not impermissibly suggestive (see discussion in Part I(B)), and the available information, including eyewitness reports at the Pizza Hut, the radio dispatch of the citizen's report, and Officer Guymon's observation from his car, we hold that the police had reasonable cause to arrest David Kysar.

## B.

### "Show Up"

Evidence of an out-of-court identification shall be suppressed only where, under the totality of the circumstances, the identification procedure was so impermissi-

bly suggestive as to give rise to a very substantial likelihood of mis-identification. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). "[R]eliability is the linchpin in determining the admissibility of identification testimony...." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977). Factors to be considered in determining whether the identification is sufficiently reliable include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the length of time between the crime and the identification. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Hoisington,* 104 Idaho 153, 657 P.2d 17 (1983); *State v. Edwards,* 109 Idaho 501, 708 P.2d 906 (Ct. App.1985).

■ Kysar's primary complaint is that the "show up" identification was unreliable because it was conducted in a suggestive manner in two respects. First, Kysar claims that covering his head with a jacket was unnecessarily and impermissibly suggestive. However, as the trial court found, the "jacket was held so that the witnesses could not see [the Kysars'] faces but viewed their bodies and clothing from the shoulders down." As previously mentioned, the robbers' faces were covered while in the Pizza Hut. The police did not want the identification to be influenced by the Kysars' facial appearance. This covering up was not impermissibly suggestive.

■ Second, Kysar insists that he and his brother were handcuffed while the eyewitnesses were present so that they would resemble guilty criminals. However, police officers present testified that handcuffs were removed before the "show up." Testimony of Sgt. Codding, Officer Guymon, Officer Vanleuven and Detective Forrest differed with Kysar's version. For example, Sgt. Codding testified that he had the handcuffs removed because he "wanted to

make it as natural as possible" even though Detective David Forrest said he wasn't really comfortable with the idea because of potential danger. In considering the testimony presented, the trial court as trier of fact did not find that the Kysars were handcuffed, but only that "a jacket was held so that the witnesses could not see their faces...." Unlike an appellate court, the trial court as trier of fact has a special opportunity to judge the credibility of witnesses who appear personally before it. It is widely accepted law that

[t]he triers of the facts may accept all of a witness' testimony, may reject it all, or may accept part and reject part, in accordance with the facts and circumstances bearing on the credibility of the witness.

98 C.J.S. *Witnesses* § 458 (1957); *see Rasmussen v. Martin,* 104 Idaho 401, 659 P.2d 155 (Ct.App.1983); Idaho Appellate Handbook, 3.3, Idaho Law Foundation (1985); I.R.C.P. 52(a). Furthermore, the trial court's findings of fact shall not be disturbed on appeal unless unsupported by substantial competent evidence. *State v. Snowden,* 79 Idaho 266, 313 P.2d 706 (1957); *State v. Curtis,* 106 Idaho 483, 680 P.2d 1383 (Ct.App.1984).[1] Although Kysar gave conflicting testimony, there is substantial competent evidence in the record that the Kysars were not handcuffed during the "show up." Furthermore, the following evidence supports a finding that the *Biggers* reliability factors were met: (1) Rudolph and Burdick were in the Pizza Hut watching as the robbery took place; (2) Rudolph and Burdick got a good look at the robbers; (3) the witnesses' descriptions to the police of the robbers' clothing were matched with the clothing worn by the Kysar brothers; (4) the witnesses gave positive identifications, citing specific aspects of the suspects' clothing which led them to their conclusions; and (5) the "show up" occurred approximately an hour after the robbery.

The trial court's findings of fact were based on substantial competent evidence,

1. Under I.C.R. 12(e) the trial court was not even required to make factual findings unless requested by any party. *State v. Kirkwood,* 110 Idaho 97, 714 P.2d 66 (Ct.App.1986).

and the *Biggers* reliability factors were met. We therefore affirm the trial court's finding that the "show up" was not conducted in an impermissibly suggestive manner.

### C.

### *Miranda*

■ When an accused person in custody has invoked his right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he is not subject to further interrogation until counsel has been made available to him, unless he waives his earlier request for counsel and himself initiates any dialogue. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). His responses to further questions in the absence of counsel may be admitted as evidence only when it is shown that he initiated further discussions with the police and that he knowingly and intelligently waived his right to counsel which he earlier invoked. *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); *State v. Culbertson*, 105 Idaho 128, 666 P.2d 1139 (1983); *State v. Blevins*, 108 Idaho 239, 697 P.2d 1253 (Ct.App.1985). Proof of such initiation must be established by a preponderance of the evidence. *State v. Culbertson*, 105 Idaho 128, 666 P.2d 1139 (1983).

Here, both Kysar and the State agree that Kysar invoked his right to counsel after being told that he and his brother were suspected of robbery. Aside from this agreed fact, Kysar's version of the facts differs significantly from that of the State.

Kysar asserts that after invoking his right to counsel the police nevertheless used various improper tactics to extract an involuntary confession which amounted to an inherently coercive custodial interrogation warranting suppression. Such tactics allegedly included: lengthy detention before booking (allegedly five hours); relocation at police headquarters into three separate rooms; handcuffing to tables in each room; failure to provide food or sleep; and police intimidation and threats.

Kysar testified that after being placed initially into a small room, he was taken into a larger room where Officer Guymon was writing a report. Kysar testified:

A. I sat there for a long time and the detective [Forrest] then came in and he told me that he would be right with me, that he was about finished with my brother. He then left the room.

Q. [By defense counsel] Then what happened?

A. Then I was sitting there, I was becoming uncomfortable, I reached into my pants and pulled out some money. The first officer at the scene asked me what it was and I said it was some money and he took it from me.

Officer Guymon testified:

A. Well, I was just sitting there typing and he asked, "How is it going?"

I answered, "Probably better than you." We just sat there quiet for a short [time] and that is when he asked how it was going and I replied, "A lot better than you."

About five, ten minutes later he reels back and sticks his hand down his pants and alerted me, what is going on here, and pulled out a white plastic bag and tossed it on the table and said, "This may help."

Q. [By the prosecutor] Prior to that time had you asked him any questions in the report room?

A. No. Just a statement, "Probably better than you." I didn't ask him any questions, just basically typing my report and watching him.

The bag contained over $500 in cash.

Kysar testified further that after he had handed the bag of cash over to Officer Guymon he was then taken into another room.

A. He [Detective Forrest] then took me back to the room that I hadn't been in, but it was a smaller room that had a two-way mirror on it. I believe it was one next to the one I had been placed in the first time.

Q. [By defense counsel] And what happened there?

A. Then he came in—well, he took me in there and he asked me if I would like a cup of coffee and I replied "yes". He left and came back.

He then asked me if I wanted to talk to him about this case and I said, "No. I want to see a lawyer."

He then told me if I cooperated with him that he would work out something with the DA and the judge where I wouldn't go to prison, I would go to Cottonwood for cooperating and stuff. I then told him I really didn't know what I should be doing right at this point.

Q. How were you feeling at that point in time?

A. I was feeling—I was scared, you know, nervous.

Q. This was the same detective that talked to you in the blue car?

A. Yes.

Q. Eventually I take it he brought you some papers to sign and fill out?

A. No, he didn't. He put me in this room, asked me if I wanted a cup of coffee. He then left the room, brought me back my cup of coffee. I already had cigarettes. He then asked me if I wanted to discuss this case with him and I said "no". I specifically said, "No, I want to see my lawyer first."

He then told me if I cooperated with him that he would talk to the DA and the judge and work out something for me.

Q. Then he went away again?

A. He was still in the room. I told him that I didn't exactly know what I wanted to do yet, I wanted to think about things. He then became defensive with me. He then told me, "Your brother has written a statement, he has told us you were involved and we know everything. There is no way you can weasel out of it."

Q. Apparently you did sign a statement or something like that?

A. Yes, I did.

Q. Is that after all of the events you have described up until now?

A. Right after he became angry with me and told me that there was no way I was going to get out of it I said, "What is it you want me to do?"

He then told me that he wanted me to write a statement. He gave me a piece of paper, he left the room. I finished the statement, he came back. He read it over and he asked me to sign it and I signed it. He then left again and then came back and at this time he reached into a folder like thing and pulled some papers out, like a briefcase, leather briefcase or folder, paper folder.

He then told me that he wanted me to sign it—I asked him what it was and he said that it was a piece of paper, that I had been read my rights.

Q. Did you sign that?

A. I signed it.

Q. Of course, he had read you your rights much earlier?

A. The first time they read me my rights was after I was identified.

Q. Did you ask the detective to come back and talk with you?

A. No, I didn't.

Q. Did you tell some other officer you wanted to talk to the detective?

A. No, I didn't. The detective came in and said he would be right with me, he would be finished right away.

Q. At what point were you booked into the jail?

A. After I had signed the paper advising me that my rights had been read, then he asked me some questions about some other armed robberies. He told me that if I copped up to them he would only charge me with one. He then asked me about some milk, you know, nothing about either of them. He then took me out and an officer took me to jail."

Detective Forrest's testimony is entirely different from Kysar's version of what occurred. Detective Forrest's testimony was supported by a tape recording of the interview made by the officer, apparently unbeknownst to Kysar, which shows that Kysar's testimony was patently false in many respects. After taking a statement from Kysar's brother, Detective Forrest testified that he was told by an officer that David Kysar wanted to speak with him. Detec-

tive Forrest then entered the interview room, the third room to which Kysar had been taken. The following is a transcript of the tape recorded conversation which took place:

Forrest: The sergeant says that you requested to talk to me now.

Kysar: Yeah.

Forrest: Okay. Before you say anything, you've indicated before that you wished to talk to an attorney, which, you know, that's no problem. You do have that right to talk to one. Are you changing your mind now and wish to talk to me without an attorney?

Kysar: Yeah [unintelligible].

Forrest: What did you say?

Kysar: Yes.

Forrest: Oh, okay. I didn't understand what the deal was here for sure. Okay. I'll read this form to you here. You do have a right to remain silent and anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer before we talk to you and have him present while we talk to you. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning free of charge. You can decide at any time to use these rights and not answer any questions or make any statements. Do you understand each of these rights I've explained to you?

Kysar: Yes.

Forrest: Do you wish to discuss this case with me at this time?

Kysar: Yes.

Forrest: Do you wish to have an attorney present?

Kysar: No.

Forrest: Okay. Your signature right here.

(Pause.)

Forrest: Why don't you tell me what it was you wanted to discuss with me.

Kysar: Any of your questions [unintelligible].

Forrest: Why don't you just start from the beginning and tell me what happened.

This foregoing transcript from the tape directly contradicts Kysar's testimony in many respects. The low key nature of the conversation recorded was unlike the intimidating confrontation testified to by Kysar. Both the testimony of Detective Forrest and the tape demonstrate that Kysar's testimony concerning the discussion he had with Detective Forrest was shown to be false and unreliable. The trial court was entirely justified in relying on the testimony of the police officers, and disregarding the testimony of Kysar in determining whether Kysar had voluntarily initiated discussions with the police officers, thereby waiving his right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). It has been the universally accepted rule of this Court, and the other courts in the United States, that when a witness has been shown to have testified falsely, a trier of fact is entitled to disregard the testimony of that witness. *Smith v. Howard*, 76 Idaho 235, 240, 280 P.2d 1060, 1063 (1955) ("While there was no direct contradiction of parts of the witness' testimony, the witness was sufficiently impeached and his testimony so contradictory in itself, that the trial court was warranted in disregarding his evidence."). *See also* 98 C.J.S. *Witnesses* § 458 (1957).[2] Here, the trial court weighed the credibility of the witnesses and resolved the conflict in favor of the State, finding that Kysar made a valid waiver of his right to have counsel present during interrogation by initiating, without reservation, the interrogation.

From the evidence submitted by the State, the trial court found that Kysar was not subject to coercive tactics designed to extract a confession, and that the officers originally ceased questioning Kysar as soon as he invoked his right to counsel. Without prompting, Kysar handed over the money apparently taken in the robbery. Not until Kysar initiated further discus-

---

**2.** As an appellate court we do not have the same opportunity to assess the witness's credibility and demeanor on the stand, and therefore we are bound by the trial court's findings of fact unless they are unsupported by substantial competent evidence. *State v. Snowden*, 79 Idaho 266, 313 P.2d 706 (1957); *State v. Curtis*, 106 Idaho 483, 680 P.2d 1383 (Ct.App.1984).

sion, and had again been given oral and written advice of his rights under *Miranda,* did interrogation commence. The record indicates that Kysar arrived at the station at about 10:45 or 10:50 p.m. and that, following his discussion with Detective Forrest, he was booked into jail at 12:42 a.m. During that less than two hour period, the police continued searching for the shirt or jacket that Kysar had apparently discarded after fleeing the Pizza Hut on that cold night. Police wanted to see if the garment, if found, fit him. Police also wanted to take their own photographs of the robbery suspects, and indicated that it could be difficult to get defendants back into the station for this purpose once they had been placed in the jail. It is not improper police conduct to handcuff to a table someone arrested for robbery by knifepoint, nor is it improper police conduct to relocate someone twice before booking. Because Kysar did not eat or sleep during the less than two hour period does not make his subsequent waiver invalid. Kysar was given coffee and cigarettes as he requested. On the basis of the foregoing facts found by the trial court, which are supported by the tape and the testimony from Detective Forrest and the other officers, we affirm the trial court's finding that Kysar made a knowing and voluntary waiver of his rights under *Miranda,* and that his statements to the police were not taken in violation of his rights under the Constitution.

## II

### SPEEDY TRIAL

■ Kysar argues that his statutory right to a speedy trial was violated because a trial was not held within six months from the day the information was filed against him. I.C. § 19–3501.[3] However, where a trial is postponed upon application of the defendant, the six-month deadline in I.C. § 19–3501 is not applicable. Because Kysar successfully moved to vacate a May 11, 1987, trial date, he waived his statutory speedy trial right under I.C. § 19–3501.[4]

## III

### SENTENCING

■ Kysar claims the sentencing court abused its discretion in imposing an unreasonable sentence, four to ten years in prison. Kysar argues that the sentencing court should have devised a plan that combined incarceration with meaningful treatment for stress stemming from attention deficit disorder.

Kysar could have received a life sentence for the crime of robbery. I.C. § 18–6503. Because his sentence was within the statutory maximum, we will uphold it unless the sentencing court abused its discretion. *State v. Nice,* 103 Idaho 89, 645 P.2d 323 (1982). A sentence may represent such an abuse if it is shown to be unreasonable upon the facts of the case. *Id.* Here, because the court specified that the minimum term of confinement would be four years, four years is the term of confinement for the purpose of appellate review. *See State v. Maxfield,* 115 Idaho 910, 771 P.2d 928 (Ct.App.1989); *State v. Sanchez,* 115 Idaho 776, 769 P.2d 1148 (Ct.App.1989). We must determine whether a four-year

---

**3. 19–3501. When action may be dismissed.—** The court, unless good cause to the contrary is shown, must order the prosecution or indictment to be dismissed, in the following cases:

....

2. If a defendant, whose trial has not been postponed upon his application, is not brought to trial within six (6) months from the date that the indictment or information is filed with the court.

....

**4.** Here, an information was filed against Kysar sometime between February 6, 1987 (the date of the order binding over), and February 11, 1987

(the arraignment date). Several trial dates were set (and not met) before Kysar entered a conditional guilty plea on August 25, 1987, which was six days before the latest trial was set on August 31, 1987 (six months, 25 days, after the order binding over). We need not address the issue of whether a delay in bringing Kysar's case to trial, resulting from the trial court's administrative schedule and not the prosecution, is not a per se violation of I.C. § 19–3501, *State v. Sindak,* 116 Idaho 185, 774 P.2d 895 (1989), because here at least one of the trial dates was vacated upon the defendant's motion.

prison term is reasonable when viewed in light of the nature of the offense and the character of the offender.

Kysar and his brother were sentenced for taking money from Pizza Hut employees by threatening them with knives. This was a very serious crime. The record indicates that although Kysar was only nineteen years old when he committed the robbery, he had an extensive criminal record consisting of other felony offenses (theft and aggravated assault) and misdemeanors (obstructing justice, assault, disorderly conduct and criminal mischief). Kysar also pleaded guilty to assaulting a law enforcement officer while in jail awaiting disposition of the present case. Extensive testimony at the sentencing hearing concerned Kysar's background, growing up in an abusive household, his present difficulty in obtaining employment and his psychological difficulty, attention deficit disorder. While this evidence may help explain how Kysar became the person that he is, it does not change the fact that he is a danger to society. However, the sentencing court took this background evidence into account and issued an order under I.C. § 19–2523 authorizing treatment for Kysar's psychological problems during his incarceration. Having considered the record, we conclude that the sentence is not excessive and that the sentencing court did not abuse its discretion. Accordingly, Kysar's sentence is affirmed.

We affirm the judgment of conviction and sentence imposed.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, dissenting.

I am unable to join the opinion which affirms the conviction of the defendant David Kysar for three reasons. But before laying out the reasons for being unable to become part of today's majority, invitation is extended to an examination of the Court of Appeals opinion in *State v. Kysar,* 114 Idaho 457, 757 P.2d 720 (Ct.App.1988),[5] a companion case to this which for unknown reasons was separated and sent to the Court of Appeals. The Court of Appeals determined that the interrogation techniques used by the police while questioning David's brother, Dale, rendered his confession involuntary. However, the Court today has blessed, if you will, or at the least approved, the procedures applied by the police to David.

The majority opinion implicitly endorses the improper procedures used by the Idaho Falls Police in the *Terry* stop, and the improper procedures in the "show up" of David Kysar and his brother, Dale. The record also demonstrates that despite David Kysar's repeated requests for counsel, he was not afforded the basic protection provided by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## I. THE *TERRY* STOP

There is no doubt that David Kysar was handcuffed and detained for some period of time prior to the show up, and the police admit there was no probable cause to arrest Kysar until after the show up was conducted. The justices of the United States Supreme Court, in their elaboration of *Terry* stop requirements, have stated that stopping someone for the purpose of investigating criminal activity which has already occurred may be allowed. *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).[6] However, the period of time allowed for purposes of investigation by the police must be limited.[7] Normally, handcuffs are not proper during

---

5. A copy of this opinion follows in the appendix to this opinion.

6. Recall that in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the stop was justified in that case as a reasonable step taken by the police to prevent an imminent crime.

7. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); and *United States v. Richards,* 500 F.2d 1025 (9th Cir.1974). In *Richards* the Court explained that in reviewing the duration of a *Terry* stop, the Court should ask whether the police are swiftly pursuing an investigation which will determine if the suspect's continued detention is justified.

a *Terry* stop.[8] The reason for these limitations is obvious: Without the support of probable cause that a crime has been committed, a person's dignity and freedom of movement may not be taken away for the purposes of police investigation, unless the police act swiftly to conclude their investigation and come to a final determination as soon as possible on the existence of probable cause to detain the person further.

The holding of *Terry v. Ohio* does not afford the police a license to detain people at their leisure. *Terry* is a concession to the practical and everyday problems of law enforcement balanced against the rights of individuals. With that in mind, I now examine the majority's treatment of the stop of Kysar by the police.

According to the majority, "[s]hortly after the detention began" the persons who viewed the crime were brought together with the suspects for the show up. Later in the majority opinion, it is stated that "the 'show up' occurred approximately an hour after the robbery." The majority finds nothing wrong with allowing the police to handcuff a complacent *Terry* stop suspect for approximately an hour before the police take the affirmative steps required to either dispel or confirm their suspicions. All that was needed to be done by the police (before the show up could properly be conducted) required a few minutes at the most. First, the police should have written down descriptions provided by the witnesses of the robbers—before the show up. Second, the police had to transport the witnesses to the suspects.[9] Apparently, both of these steps were taken. Was it reasonable that these steps would consume an hour? Highly doubtful, and most questionable.

Given the proximity of the scene of the crime to the road where Kysar was stopped, there can be found no justification for the police to have forcefully detained Kysar for an hour. This is not a trivial point, because it is also clear that in the meantime the police were conducting a wide-ranging investigation, which included a warrantless consent search[10] of Kysar's dwelling, and a search of the garage and the car Kysar had been traveling in. The initial efforts by the police to search the duplex apartment and begin questioning the suspect in this case were not appropriately expended, because the first priority of the police should have been the determination of whether further detention of Kysar was warranted. The only way to determine whether further detention of this *Terry* stop suspect was justified was through a show up. In the future, the use of a *Terry* stop for investigation purposes will, perhaps and hopefully, be kept short and to the point.[11]

**8.** In this case, not only handcuffs were used, but the complacent Kysar brothers were also, prior to any show of resistance or recalcitrance, subject to the drawn service revolver of one officer and the shotgun of another. As LaFave and Israel explain:

> Another important issue is whether the police conduct may still qualify as a lesser intrusion and thus a *Terry* stop if it includes force or a threat of force. Though it has occasionally been held that such action as surrounding the suspect or drawing weapons converts the police conduct into an arrest because the 'restriction of * * * "liberty of movement" was complete,' this is in error, for a stopping differs from an arrest not in the incompleteness of the seizure but in the brevity of it. The better view, therefore, is that surrounding the suspect will sometimes be an appropriate way of making the stop and maintaining the status quo, just as the drawing of weapons will sometimes be a reasonable precaution for the protection of officers and bystanders. Handcuffing ordinarily is improper, but may be resorted to when necessary to thwart the suspect's attempt 'to frustrate further inquiry.' [Footnotes omitted.]

W. LaFave and J. Israel, I Criminal Procedure 297 (1984). The record is void of any indication that the Kysars gave the police reason to believe they would "frustrate further inquiry." In fact, it appears from the record that the Kysars were ready to communicate and comply with the officers' requests in a complacent manner.

**9.** Transporting and detaining the suspects (on less than probable cause) to the police station before the show up would have been illegal. *See Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985).

**10.** The common law wife of David's brother consented to the police search of the duplex apartment.

**11.** It seems that the idea of conducting a show up as the appropriate next step came slowly to the police. As one officer later described it,

1002

## II. THE SHOW UP

Moreover, it is obvious to the extreme that the show up was utilized to heighten instead of lessen the already suggestive circumstances. A show up is always suggestive because it focuses the witnesses' attention on the one suspect, without the check afforded by a line up. In a line up, the witnesses must pick the suspect out of a group. During a show up, the suspect is the only "pick" available. The United States Supreme Court recognized this, and noted in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967):

> The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup has been widely condemned.

388 U.S. at 302, 87 S.Ct. at 1972 (footnote omitted). *Stovall* goes on to state that a due process attack on a show up must be analyzed by considering the "totality of the circumstances surrounding [the show up]." *Id.* In consideration of the totality of the circumstances it is impossible to find or invent a justifiable reason for covering Kysar's head with a leather jacket before the witnesses were allowed to view the suspect.

Kysar and his brother were the only two people the witnesses would view during the show up. Where two people committed the robbery the obvious conclusion for the witnesses to draw could only be that the two individuals surrounded by three policemen were the robbers. The witnesses had stated, prior to the show up, that they had been unable to see the robbers' faces. Apparently the police decided the show up would be less suggestive to the witnesses if the two suspects were viewed with their faces veiled. Yet, if the witnesses could not see

after a handcuffed Dale Kysar had been escorted into his rented duplex:

> About this time I realized that without some kind of an identification we didn't have anything, we were just going to identify the people and release them once they found out who they were, so I decided that I would have the officer that was currently talking to the witnesses to bring the people that could possibly I.D. somebody to the scene to see if we could set some kind of an identification of these individuals.

the robbers' faces, there would be no reason to cover the suspects' faces during the show up. During a show up, suspects should be allowed to appear as naturally as possible, to dispel as much of the suggestiveness of the show up as possible. During this show up, the already suggestive circumstances were improperly exacerbated by the actions of the police.[12]

## III. MIRANDA WARNINGS

Even more egregious than the unnecessary force used in making the *Terry* stop, and the improper and suggestive show up, was the police's denial of Kysar's right to counsel. Before the government can use any incriminating statement made by a detained defendant it must administer a timely *Miranda* warning, and where that has been done, a defendant's statements cannot be used without proving an intelligent and knowing waiver of the accused's *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If an accused indicates, either before or at any time during interrogation, his desire to remain silent, then all questioning must cease. The United States Supreme Court has consistently reiterated the protection available to a suspect who exercises in any manner his or her right to the presence of counsel:

> [A]n accused.... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

R., Vol. 2, 267.

12. Not too long ago, the Court was considerably more concerned about the suggestive circumstances surrounding show ups. *See State v. Sadler*, 95 Idaho 524, 511 P.2d 806 (1973). Justice Bakes, writing the majority opinion, stated: "[W]e cannot sustain the police identification procedure in this case. *See Stovall v. Denno, supra.* Both appellants were displayed ... shackled by handcuffs and accompanied by police officers." 95 Idaho at 529, 511 P.2d at 811.

*Edwards v. Arizona,* 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). The Supreme Court recently reaffirmed this rule when it held that post-*Miranda* responses to further interrogation cannot cast retrospective doubt on an earlier, unambiguous request for the presence of counsel. *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).

This Court, with prompting from a directive of the Supreme Court of the United States,[13] applied that rule of law in *State v. Monroe,* 103 Idaho 129, 131, 645 P.2d 363, 365 (1982):

> The case before us is also similar to *Edwards* in that the defendant requested counsel but the confession was obtained without the benefit of counsel being present and only after the police officer initiated further interrogation by asking the defendant if he would like to give his side of the story. Therefore, following *Edwards,* we find that because the defendant asked for counsel three times and was not given the opportunity to deal with the police through counsel, the confession that was a result of police-initiated interrogation must be suppressed. We reverse and remand for a new trial with directions to suppress the confession obtained in violation of the defendant's right to counsel.

In the present case, defendant David Kysar unequivocally and expressly invoked his right to counsel on at least three occasions. First, Sergeant Codding, after reciting the *Miranda* warnings to Kysar, asked whether Kysar understood them. Kysar replied "I'd like to see my lawyer." Sergeant Codding testified that he heard Kysar utter these words. Detective Forrest was also aware, from conversations with the other officers at the scene, that Kysar had asked for an attorney out in the alley prior to his being taken to Forrest's detective unit.

Second, Mr. Kysar renewed his request for an attorney when he was placed in the back seat of Detective Forrest's vehicle.

After some questioning, which included Forrest's statement that he would go to prison for sure if he didn't cooperate, Kysar told the detective "all I wanted was to see my lawyer." Detective Forrest's testimony does not contradict Kysar's testimony on this point. Detective Forrest also verified Kysar's testimony that after he had expressed his desire to see his lawyer for a second time, Forrest told Kysar about a jacket lying on the side of the road with hair in it that could be matched to Kysar's hair, and result in a conviction. It would be, according to Forrest, to Kysar's advantage to cooperate.

The third occasion Kysar invoked his right to counsel occurred at the police station after Kysar was returned to a small interrogation room. Kysar recalled that Detective Forrest asked him if he would like to talk to Forrest about the case, to which he replied: "No. I want to see a lawyer." What transpired after Kysar's repeated and unequivocal requests for counsel reveals other instances of improper police conduct. Kysar was improperly subjected to the functional equivalent of interrogation after he invoked his right to counsel. The United States Supreme Court addressed the question of what constitutes interrogation in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The court in *Innis* held that:

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response* from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda safeguards were designed*

**13.** 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 385 (1981). The high court vacated the judgment, and remanded the case for further consideration in light of *Edwards.*

*to vest a suspect in custody with an added measure of protection against coercive police practices,* without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

446 U.S. at 300–301, 100 S.Ct. at 1689–90 (footnotes omitted; emphasis added). So for example, by continuing the interrogation of Kysar, after his second request to see his lawyer, the police did not honor *Miranda v. Arizona.*[14]

Kysar was also improperly shuffled from room to room, and was not promptly booked into jail after he arrived at the police station. Sergeant Codding testified that he did not take Kysar directly to the jail as is the normal procedure, but instead took him to a small room where he was handcuffed to a table. The reason Kysar was not booked into the jail at the time he was brought to the Law Enforcement building is readily apparent: The police wanted the confession which they ultimately obtained. Because Kysar had repeatedly invoked his right to counsel, he was not initially interrogated at the station, but handcuffed to a table in a small interrogation room, then in the large report room, and then, finally, in a small interrogation room again, at all times restrained from mobility by handcuffs tethering him to furniture. Meanwhile, the officers were interrogating his brother, Dale Kysar, until a break in the case might be achieved. In time Detective Forrest told David Kysar that Dale had written a statement implicating him. Notwithstanding the fact that Kysar, only minutes before, for the third time, expressly and unequivocally invoked his right to counsel, Detective Forrest became angry, according to Kysar, whereupon Kysar relented, asking "what is it you want me to do." Thereupon Forrest advised him that he should write a statement, which he did. *After* Kysar wrote the statement, Detective Forrest presented him with a Rights Waiver Form which he signed. As soon as the statement and waiver were signed, at approximately 1:30 or 2:00 a.m., the 5th of February, 1987, Kysar was taken to jail—some five hours after his initial detention, and four and one-half hours after the time he first invoked his right to counsel.

This combination of circumstances constitutes inherently coercive custodial interrogation and warrants suppression of the confession. *See Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944). In *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), the United States Supreme Court held that a period of five hours prior to confession was enough to constitute an extended period of incommunicado interrogation, the confession coming at the end of that period of time. The United States Supreme Court has also found the procedure of moving a suspect from room to room could vitiate the voluntariness of a confession, as being "shuttled back and forth" between interrogation rooms tends to have a disorienting affect. *Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961).

The teaching of *Miranda* is clear and readily understood: An accused's or a suspect's fifth amendment privilege is protected from the inherently coercive effects of custodial interrogation. Contrary to the *Miranda* mandate, and contrary to the rule of *Monroe,* it is clear that the police elected to intimidate, threaten and attempt to elicit incriminating responses from David Kysar notwithstanding that he thrice invoked his right to counsel. In short, the police did not respect his request. Moreover, they made no excuse for holding him incommunicado and immobile for some four and one-half hours, thereby diminishing his, or anyone's, resolve to steadfastly remain silent until an attorney appeared to counsel him. There was no valid reason for not booking him into jail, at which point

---

**14.** The bright line rule that an accused who has exercised his right to presence of counsel may not be subjected to further interrogation by the authorities until counsel has been made available to him was reaffirmed in *Smith v. Illinois,* 469 U.S. 91, 93, 105 S.Ct. 490, 491, 83 L.Ed.2d 488 (1984), where the accused merely responded: "Uh yeah. I'd like to do that," in response to being informed of his right to the presence of an attorney.

he would have had access to a telephone. Thereafter he would have been safely in a cell, no longer handcuffed, and free from the not-too-subtle tactics which finally did break his resolve. While chained to a table or chair for the entire time, he was kept advised that his brother had submitted to an interrogation which was going on in another room. Such blatant violations of constitutional rights as occurred in this case demand that the written confession and other oral statements made by David Kysar should be suppressed and that the conviction be reversed, and the cause be remanded for further proceedings.

APPENDIX

State of Idaho, Plaintiff–Appellant,

v.

Dale James KYSAR,

Defendant–Respondent.

No. 17039.

Court of Appeals of Idaho.

July 5, 1988.

BURNETT, Judge.

Dale Kysar stands accused of robbery. The case comes to us on appeal by the state from an order suppressing inculpatory statements made by Kysar during custodial police interrogation. The sole question presented is whether the staements were made voluntarily. For reasons explained below, we conclude that they were not. Accordingly, we affirm the suppression order and remand the case for further proceedings.

The underlying facts may be stated briefly. Dale Kysar and his brother David were charged with robbing a Pizza Hut restaurant in Idaho Falls. After Dale was booked into the local jail, he was placed in an interrogation room. He was crying and visibly upset. At some point, he asked to speak with the detective in charge of the investigation. The detective agreed to meet with Kysar. They engaged in a thirty-minute conversation during which Kysar made statements admitting his involvement in the robbery. The conversation was recorded. Kysar also gave a written statement concerning the crime. Subsequently, Kysar filed a pretrial motion to suppress his statements because they had been induced by promises of leniency by the interrogating detective. The district judge agreed and granted the motion. This appeal followed.

The issue before us is governed by the constitutional standard of voluntariness under the Fifth and Fourteenth Amendments. *See generally State v. Hiassen,* 110 Idaho 608, 716 P.2d 1380 (Ct.App.1986). No additional question has been raised as to the procedural safeguards established in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Voluntariness in the constitutional sense must be shown by the totality of circumstances surrounding police efforts to obtain incriminating statements. *See* 2 W.E. RINGEL, SEARCHES & SEIZURES, ARRESTS AND CONFESSIONS § 25.1 (2d ed. 1988) (hereinafter cited as RINGEL). A statement is voluntary if it is the product of a free will. *State v. Powers,* 96 Idaho 833, 537 P.2d 1369 (1975). Under this standard, it must be determined that the statement was not extracted "by any sort of threats or violence, nor obtained by any direct or implied promises...." *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

When this standard is applied on appeal our task is two-fold. First, we defer to the lower court's findings of fact, if they are not clearly erroneous. *See State v. Moulds,* 105 Idaho 880, 673 P.2d 1074 (Ct.App.1983). Second, we exercise free review over the question whether the facts found are constitutionally sufficient to show voluntariness. *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *State v. Blevins,* 108 Idaho 239, 697 P.2d 1253 (Ct.App.1985). In the present case, the facts surrounding Kysar's confession are undisputed. Therefore, our analysis consists solely of determining whether the confession was voluntary as a matter of law.

The recorded conversation in the interrogation room included two exchanges which form the basis of Kysar's challenge to the voluntariness of his ensuing statements. The pertinent portions are excerpted below.

[Detective]: Why don't you start from the beginning and tell me what happened?

Kysar: What can you do for me?

[Detective]: Well, it depends on what you tell me. You know, like I say, it's always best to cooperate and tell the truth. And the judge looks at that and the prosecutor looks at that and say, hey, you know, this guy's got a good attitude. He might be worth rehabilitating. A guy that sits back and says "up yours" and "screw you guys" and "I don't want to talk to you or nothin'" you know, they figure, hey, this guy's a lost cause, you know. So you kind of see where we're at and where the judge is at, so he can ...

Kysar: *Will I be out of jail by the time my baby is born?*

[Detective]: *When will your baby be born?*

Kysar: *Well, you know, say, five months.*

[Detective]: *Five months? I'd say that's a pretty safe bet.* Like I say, what they do is tomorrow morning there'd be an arraignment, okay? They would set a bond. Depending on how the case would go, if you were to come out and admit to it and plead guilty what they would do is do a background investigation on you.

....

Kysar: I'm a good guy, you know, that's just the problem.

[Detective]: Yeah, I think you have a good attitude. I don't think you're a lost cause or anything like that. I think you're just under some stress, like you say, and just pushed into doing something, you know.

Kysar: (Inaudible.)

[Detective]: *When I talk to the prosecutor, I'll tell him that you're totally cooperative with me and didn't give us a bad time about it or nothing, he just* *wanted to come clean and clear it all up. And when it comes around to the sentencing and stuff that'll make a big difference I'm sure.* So let's go ahead and we'll have you do a real quick written statement, basically where you planned to go over and did the so-called surveillance on the business. [Emphasis added.]

As the emphasized portions indicate, the detective represented that Kysar probably would be out of custody in time to see his child born and that the detective would inform the prosecutor of Kysar's cooperation.

In his ruling on the motion to suppress, the trial judge focused solely upon the second assertion. He concluded that it was impermissible "[t]o assure a suspect that the prosecutor will be informed of his [the defendant's] cooperative nature...." With this conclusion we cannot agree. A mere representation of intent to inform a prosecutor of the defendant's cooperation, when not connected to any promise of a specific benefit, is not an implied promise of leniency requiring suppression of an inculpatory statement. *See, e.g., United States v. Curtis,* 562 F.2d 1153 (9th Cir. 1977). However, such a representation is one significant factor to be considered in analyzing the totality of circumstances. *See* RINGEL § 25.2(c).

The other emphasized portion of the conversation, where the detective said it would be a "safe bet" that Kysar would be out of jail in time to see his baby born—is more problematic. Although the detective's statement could be rationalized on the technical ground that Kysar might have received a pretrial release on bond within the time indicated, we do not view voluntariness through a filter of technicality. We focus on the meaning that reasonably would be ascribed by a lay person to the words spoken. So understood, we think the detective's statement amounted to an implied promise that if Kysar cooperated, his incarceration for the offense would be completed before the child was born. Furthermore, regardless of which interpretation were adopted, the detective making the assurance did not have the authority to

fulfill it—and Kysar was not apprised of that fact.

Based upon our independent review of the totality of the circumstances surrounding the confession, we conclude that the detective's representations, taken together, were sufficient to undermine Kysar's free will. Therefore, his confession was not voluntary. It correctly was suppressed.

The order of the district court is affirmed.

WALTERS, C.J., and SWANSTROM, J., concur.