861 P.2d 59

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Richard Charles ALBERTS, Defendant–Appellant.**

**No. 19656.**

Supreme Court of Idaho, North Idaho, May 1993 Term.

Sept. 27, 1993.

Norman L. Gissel, Coeur d'Alene, for defendant-appellant.

Larry EchoHawk, Atty. Gen., and Douglas A. Werth, Deputy Atty. Gen., for plaintiff-respondent. Douglas A. Werth argued.

McDEVITT, Chief Justice.

Alberts was charged with one count of lewd conduct with a minor in Kootenai County as a result of his call to the Spokane, Washington, police department, wherein he stated that he was a pedophile and had molested his girlfriend's eleven year old daughter. He admitted further that he had fondled the girl more than five but less than ten times and that on two occasions he put his finger in her vagina. Alberts pleaded guilty to the Kootenai County charge. He was also charged in Washington state and pleaded guilty to that charge.

The district court in Kootenai County sentenced Alberts to a term of life imprisonment with a fixed minimum sentence of ten years and retained jurisdiction for 180 days to further evaluate Alberts. After the 180 days had passed, the district court relinquished jurisdiction. This order had

---

**4.** 124 Idaho at 486, 861 P.2d at 56 (*citing United States v. Barker*, 514 F.2d 208 (D.C.Cir.1975).

the effect of executing the imposed sentence.

Alberts then filed an I.C.R. 35 motion to reduce the sentence. In support of his motion, Alberts presented the evaluation and recommendations of Dr. Edward Deatherage, a clinical psychologist. Dr. Deatherage, following his evaluation of Alberts, recommended that he be placed in outpatient therapy with a Dr. Card under the conditions recommended by the presentence investigator. The district court, after hearing oral argument on the motion, reduced the fixed portion of the sentence to five years, but declined to reduce the indeterminate life portion of the sentence.

On appeal Alberts argues that the indeterminate life portion of his sentence is too severe and should be modified to a ten year term. For the reasons stated below, we affirm the district court's order upon the I.C.R. 35 motion.

### DISCUSSION

### 1. Alberts did not file a notice of appeal from the imposition of the original sentence.

Idaho Appellate Rule 14(a) requires a notice of appeal to be filed within forty-two days after the entry of the sentence. Here, the order relinquishing jurisdiction, which caused the sentence to be imposed, was filed on April 26, 1991. Thus, the notice of appeal had to be filed no later than June 7, 1991. Alberts did not file his notice of appeal until November 22, 1991. Thus it is untimely as to the original sentence. *See State v. Repici,* 122 Idaho 538, 540, 835 P.2d 1349, 1351 (1992); *State v. Wargi,* 119 Idaho 292, 293, 805 P.2d 498, 499 (1991).[1] Accordingly, our review is limited to the appeal from the order upon Alberts's Rule 35 motion.

### 2. The district court did not manifestly abuse its discretion at the I.C.R. 35 motion.

■ As a practical matter, the untimely notice of appeal will not affect the outcome of this case because our standard of review of Rule 35 motions is that the decision will not be disturbed in the absence of an abuse of discretion based upon a review of the entire record and application of the same criteria used to determine the reasonableness of the original sentence. *See State v. Haggard,* 110 Idaho 335, 337, 715 P.2d 1005, 1007 (Ct.App.1986); *accord State v. Smith,* 117 Idaho 657, 658, 791 P.2d 38, 39 (Ct.App.1990). Thus, in those cases where only the reasonableness of a sentence is being challenged, an appeal from a sentence and an appeal from a Rule 35 motion are essentially the same.

■ At the Rule 35 hearing, the district court reduced the fixed portion of the sentence from ten to five years. The court, however, refused to reduce the indeterminate life term. Alberts now argues that the indeterminate portion of his sentence is unreasonable and should be modified to a ten year maximum.

In *State v. Broadhead,* 120 Idaho 141, 814 P.2d 401 (1991), the Court held that in reviewing the reasonableness of a sentence, "we are exercising our authority as an appellate court to determine whether the trial court abused its discretion." 120 Idaho at 143, 814 P.2d at 403. The Court went on to say that

> [w]here reasonable minds might differ as to the sufficiency of time of confinement, the discretion vested in the sentencing court will be respected. *Holmes v. State,* 104 Idaho 312, 658 P.2d 983 (1983). Our task is one of deciding whether a clear abuse of discretion has been affirmatively shown and the question is

1. We note that the time in which to note an appeal from a criminal judgment, order, or sentence is terminated if a post-trial motion which could affect the sentence is filed within fourteen days. I.A.R. 14(a). In that case, the appeal period begins to run after the post-trial motion has been decided. However, in this case, Alberts's I.C.R. 35 motion did not terminate the

time in which to file the notice of appeal because it was filed on May 22, 1991, twenty-six days after the order relinquishing jurisdiction was filed. It appears that Alberts hired a new attorney between the original sentencing and the I.C.R. 35 motion, which might explain his failure to file a timely notice of appeal.

whether the sentence is unreasonable upon the facts of the case. To establish that the sentence imposed was improper, the defendant must show in light of the governing criteria, [that the] sentence was excessive under any reasonable view of the facts.

*Broadhead,* 120 Idaho at 145, 814 P.2d at 405, *quoting State v. Small,* 107 Idaho 504, 505, 690 P.2d 1336, 1337 (1984).

The Court has previously held that we will consider the fixed portion of the sentence as "the term of confinement for the purpose of appellate review." *Broadhead,* 120 Idaho at 146, 814 P.2d at 406, *citing State v. Kysar,* 116 Idaho 992, 999, 783 P.2d 859, 866 (1989). The *Kysar* Court adopted this standard of review from the Court of Appeals opinion in *State v. Sanchez,* 115 Idaho 776, 777, 769 P.2d 1148, 1149 (Ct.App.1989).

Alberts concedes that his five year fixed sentence is not unreasonable. However, the gravamen of his appeal is that we should consider the indeterminate life sentence as the probable term of confinement for the purpose of appellate review. According to Alberts, the Commission on Pardons and Parole currently does not grant parole to anyone convicted of a sex offense because of the requirements of I.C. § 20–223(b). That statute provides that no sex offender may be granted parole "except upon the examination and evaluation of one or more psychiatrists or psychologists [and that] such evaluation shall be duly considered by the commission in making its parole determination." Alberts asserts that, as there is no treatment for sex offenders within the Idaho correctional system, I.C. § 20–223(b) will bar his parole because he will not be able to show the type of rehabilitation necessary to receive a favorable parole recommendation from the examining mental health professional. Therefore, Alberts asks us to partially overrule *Broadhead* and *Kysar* and review his sentence as though he was going to serve the entire life term.

We decline to address this issue. because it was raised for the first time on appeal. Although Alberts, in his written I.C.R. 35 motion, requested that the sentence be reduced because it was too severe, he did not state wherein it was too severe. At the argument on the motion, Alberts did not even address the issue of whether the indeterminate life sentence should be reduced, much less argue it should be reduced for the reasons argued on appeal. Instead, he focused exclusively on his argument that the fixed minimum should be reduced. As noted above, Alberts actually prevailed on this portion of his motion.

We also note that there is no evidence in the record to support Alberts's claim that no sex offenders are being paroled. It is possible that sex offenders are being granted parole notwithstanding the strictures of I.C. § 20–223(b).[2] In that case, there would be no reason to alter our current standard of sentence review. If his argument had been raised in the district court, Alberts could have developed the factual record needed for the trial court, and this Court, to fully evaluate his argument.

As it is, the trial court was not given an adequate opportunity to consider whether it should reduce the indeterminate fixed life term in light of Alberts's allegation that he will actually serve the maximum term. Because we have consistently held that this Court will not consider issues raised for the first time on appeal, unless they allege fundamental error, *State v. Lavy,* 121 Idaho 842, 844, 828 P.2d 871, 873 (1992), we decline Alberts's invitation to make such a sweeping change in the appellate review of sentences until we are presented with a case where the challenge which was here raised has been fully presented in the district court.

Accordingly, the order upon Alberts's I.C.R. 35 motion is affirmed. *See Olds v. State,* 122 Idaho 976, 976–78, 842 P.2d 312, 315–16 (Ct.App.1992).

JOHNSON, TROUT and SILAK, JJ., concur.

---

**2.** The statute, after all, only requires the Board to consider the evaluation of the psychiatrist before making the parole decision. It does not expressly condition parole upon receiving a favorable evaluation.

BISTLINE, Justice, specially concurring.

## I.

The effect of I.C. § 20–223(b) on the sentencing of sex offenders has been a recurring problem before our Court of Appeals. In *State v. Wargi,* 119 Idaho 292, 805 P.2d 498 (Ct.App.1991), the defendant was sentenced to a ten year term with a three year minimum for lewd conduct with a minor. Although the Court of Appeals affirmed the sentence, Judge (now Justice) Silak observed that "[a]bsent treatment, it seems likely that the Commission will require [the defendant] to serve his full sentence of ten years. Although a sentence of ten years' incarceration without treatment may accomplish the goals of protecting society, retribution and deterrence it does nothing to rehabilitate a person with [the defendant's] psychological problems." 119 Idaho at 295, 805 P.2d at 501 (Silak, J. specially concurring). Likewise, district judge Hurlbutt sitting pro tem in *State v. Smith,* 117 Idaho 657, 659, 791 P.2d 38, 40 (Ct.App. 1990), noted the dilemma "where little rehabilitation allegedly is available in the penitentiary and where I.C. § 20–223 places stringent requirements for [a defendant's] possible release on parole." *See also State v. Bartlett,* 118 Idaho 722, 800 P.2d 118 (Ct.App.1990).

Nevertheless, the Court of Appeals has refused to consider the maximum term as the probable length of confinement for purposes of sentence review in sex offense cases. In *Smith,* 117 Idaho at 659, 791 P.2d at 40, the Court of Appeals did not directly confront the standard of review issue but simply noted that the maximum term of fifteen years was not unreasonable. In *Bartlett,* 118 Idaho at 724, 800 P.2d at 120, the Court of Appeals refused to review the indeterminate portion of the sentences stating that "[a]ny inquiry into future parole determinations by the commission is premature and beyond the scope of our concern."

This justice notes that the Court of Appeals' observation in *Bartlett* does not seem applicable to Alberts's argument. Alberts does not argue that he is entitled to parole. He is claiming that he is not going to receive parole and, therefore, his maximum sentence (imposed under the erroneous assumption that he would receive parole well before the expiration of the maximum term) is excessive. It is his sentence which he attacks, not some future parole decision, as was the case in *Bartlett.* Thus, I do not see Alberts's attack on his sentence as premature. Nor do I consider *Bartlett* as any kind of a bar to a challenge of this type. In fact, a direct appeal may be the only opportunity to raise this issue in light of the Court of Appeals holding in *Ratliff v. State,* 115 Idaho 840, 842, 771 P.2d 61, 63 (Ct.App.1989). The *Ratliff* court held that a sentence which is "within lawful limits" may not be challenged in a petition for post-conviction relief. Thus Alberts cannot wait until he is denied parole and then attack his sentence because the time in which to file a direct appeal will have expired, and the issue probably cannot be raised in a petition for post-conviction relief.

What needs to happen in order to properly present this issue for resolution is that the defendant must argue against the imposition of the statutory maximum sentence and augment that argument with the presentation of evidence which effectively illustrates that sex offenders are not receiving parole. If the district court, after considering that evidence, still imposes the statutory maximum sentence, at least one member of this Court will be prepared to modify our *Broadhead/Kysar* standard of review and consider the maximum term as the probable length of confinement for sentence review. That day is not yet here.

## II.

Alberts is undoubtedly correct when he says that he should be in treatment for his psychological sickness. And he very well may be correct in stating that the lack of rehabilitative programs along with the parole requirements of I.C. § 20–223(b) create a nearly insurmountable obstacle between him and release on parole. At the same time, Alberts must recognize that the trial courts face an equally difficult problem

presented by the flip side of that same toss of the coin. Given the lack of treatment in the institution, the district courts are faced with an insoluble conundrum. Just as Alberts will find it difficult to improve enough to be granted parole unless he receives treatment in prison, the district courts will find it difficult to show much leniency to a sex offender who is a high risk to reoffend when he is released from custody.

Alberts's plea that sex offender treatment should be available in our prisons would better be made to the legislature.[3] It has the power to create such a program. For the record, this individual justice believes that such treatment would be money well spent. The current state of affairs leaves the district courts with no real alternative other than to have sex offenders simply mark time in prison, at great monetary expense to the taxpayers, while nothing is done to improve or aid the plight of offenders, the victims, or society.

## APPENDIX A

DEFENDANT: Mr. Wiebe has asked that I tell you a little bit about what I have discovered about myself and what I know about the program, what has occurred in the program down in Utah, and what I see happening in the program down in Utah so that you have a better feeling for what Mr. Card is doing and Mr. Card is about.

It's exceedingly hard to try to talk about some of these things because in coming up here and talking to the court, in a clinical setting it's really hard to try to talk about these things and work with these things. In a group it gets a lot harder because there is more people and walking up in front of people that I don't know and I have no idea of where they're coming from or where they're at in trying to talk about these things makes it even harder.

One of the biggest problems that I face is a terrible self-image. And in trying to talk about these things I have to admit things and talk about things that I am discovering and maybe have known some of them in the past that I've been afraid to talk about because it makes me feel real vulnerable and it's a fear that if you know more about me you're going to hate me and you're going to do the most terrible things you can to me.

So they're real hard to talk about, but Klaus asked that I sit down for an hour or two this morning and try to write some of these things out, and I would like to try to share some of them with you.

As far as the discoveries that I've made about myself, I come from a strongly dysfunctional family.

Parenting when I was a child was virtually non-existent, I'm the last of ten children. My father was an alcoholic and my mother worked hard to try to support the family, but there was some resentment and some things on her part that I'm learning about and trying to deal with on some mixed messages. I can remember messages of: I wish that I would have aborted you, but you're here, and I love you, and things like that from her.

She martyred a lot because of the way that she worked and tried to support the no-good husband she had. We were excessively poor when I was young. With the ten kids and my mother working at a labor type job or a clerical type job, there wasn't a lot of money for the family. I remember a lot of hand-me-downs, church help, and things like that to get by. I never felt any love for my parents. There is a strong emotional void inside me consisting of a lack of feeling of acceptance, and love, especially from adult females.

I've worked both individually and in group with this, and I'm going to bounce around some because I'm not super pre-

---

**3.** Alberts made an eloquent plea for treatment at his sentencing hearing to the district judge who apparently was not content to remain oblivious to the obvious. Credit is due to all participants, especially the district judge for his compassion in hearing out the extent of Alberts's plight as fully narrated. Perhaps an enlightened legislature will search out a way to assist the unfortunate who are afflicted with pedophilia. Alberts's statement in support of his request for treatment is attached hereto as Appendix A.

pared for this. I have worked both in individual and group on some of that and see how what I learned as a child is affecting me now. It's extremely inhibiting in relationship with any adults, especially females, in a fear when I'm trying to deal with them that I'm a bad person and they don't care about me.

It's obvious and it's common with a pedophile that I have an extremely low self-image. I don't feel good about myself and I tend to act out and live up in ways that predict that. I spent nine and a half years at URM Stores in Spokane as a systems analyst, but I wasn't progressing and barely maintaining at the job because of the same problems that have allowed me to allow myself to offend.

The low self-image and the bad feelings about myself cause me to oftentimes manifest a facade where I get cocky or I appear insubordinate, and I've had problems with that in the past, because if I let people really see me, again, there's the fear that they aren't going to care about me.

I have learned from Dr. Card some of the methods that I use in being unable or not dealing with conflict. The low self-image, the pain, the fears, and being afraid to deal with things have led me to extensive and substantial drug and alcohol abuse. Oftentimes I keep myself in a mental state or I affect a mental state internally that I keep myself so confused I can't focus on a problem.

I use another tactic for diversion of concentrating on an insignificant factor and not dealing with important factors when I'm trying to deal with conflict.

Mr. Card has focused a lot, because of the therapy and why I'm there, because on my inappropriate relationships with children that I've had in the past in the non-sexual connotation, not to negate the sexual abuse and the criminal behavior. But I tend to deal at their level of maturity and my own maturity, emotional maturity is extremely retarded and I tend to deal at an adolescent level of emotional maturity. I don't deal in a proper adult to child manner.

I have a preoccupation with children's acceptance of me because of what I learned, what I internalized and learned as a child that I'm not accepted by adults. And there is a need to be accepted and I have turned to children to fill that need in a very destructive and criminal manner. I have a real inappropriate drive outside of sexual abuse to try to help a child that I see or I perceive of as not being loved or cared for in the way that I now understand I felt I lacked as a child. I didn't understand these things before, but I'm getting a better picture of these things now.

It's real common but I have real strong denial mechanisms, and it's amazing to me to watch the adroitness with which some of those denials have been addressed in circumstances that I'm in.

Again, due to my lack of maturity, I've been extremely hedonistic and more like a child concerned more with immediate gratification and not having proper adult perceptions of consequences. I have a condition diversion in large sense because of my fear of adult women to adult women in adult relationships.

Frankly and honestly I'm more comfortable with children because I'm less afraid of children. I've probably never had an adult healthy relationship.

I'm discovering a lot about some of the pain and the things that are inside me and the high anxiety that I've got to deal with it.

It's a few things that I have gotten into in a treatment, in six months we have hit on a lot of things and it's tough to try to come before the court and tell you about them. But those are some of the things.

As far as the treatment program goes, Dr. Card's treatment consists primarily of four aspects: drugs, which are the antabuse and progesterone that Mr. Wiebe has told you about; medical supervision to make sure that the drugs are working as they should and not affecting me in adverse manners otherwise; psychological counseling or psychotherapy through Dr.

Card in the group; and a strongly controlled environment through the use of my family in Utah.

The controlled environment Mr. Wiebe has talked about, and some of this may be a little bit redundant, but I'm living with my sister and brother-in-law down in Clearfield, Utah. As he said, they're strong, really religious. They monitor the daily oral doses of the drugs. They monitor all my capital expenditures or any finances to make sure that I'm not sneaking any money out that could be used for any improper—for any drugs or anything.

They preview in the morning and review at night a daily log of any activity that I will be having for the day, my social circle. And my social contact is limited at this point to another brother living down in Clearfield and a niece that's living down in Clearfield, and work. The log is kept accurate to within 15 minutes of time in any block, which if you ever tried to do it is pretty hard to do when you're talking about freeway traffic and things like that. But it's kept really close.

Dr. Card's primary concern, and society's primary concern is that I not be allowed to commit any illegal acts. This structured environment is what Mr. Card has demanded be in place as a condition of acceptance into his program, and he's in contact with my brother-in-law and sister.

As far as Dr. Card goes and the psychological aspect, Mr. Wiebe has said that he's highly regarded in the field. When looking for somebody to treat this because of the lack of success last time, my family was highly motivated to find the best treatment that they could and I was highly motivated to seek out the best treatment that we could find.

Mr. Card does come very highly recommended. He's active, and in fact he just returned from an international conference up in Canada where he presented a paper of a group of world-wide psychologists and psychiatrists that are involved in the treatment of this specific disease or affliction. He's been working in this field exclusively for the past 20 years. From what I understand, and it is hearsay, but what I understand his recidivism is as low—is it's well above average as far as national statistics go, and I've heard nothing but really good things about his success rates.

As he said I'm in individual and group therapy weekly at least, and on numerous occasions I've been in to see Dr. Card individually on a couple occasions in a week. Individual sessions tend to focus on a particular problem, and group is used to reinforce or manifest a clearer awareness of what's going on or what's discovered in individual sessions.

One of the great things about this program, and something I don't know how unique it is, but it's I believe very effective, is that the group is made up of both offenders and victims. The group that I attend currently consists of, it changes, but currently consists of four offenders, two of which have spouses that attend, and three victims, all three of which have spouses that attend.

Couple examples of how group might work is in individual therapy one time we worked on my lack of ability or denial to really feel and see the harm that I have done to children and the way that I try to avoid dealing with that awareness. He worked extensively on it in individual, and that night in group the hour and a half was spent with the three victims very emotionally explaining how their lives have been affected and what they have gone through in their lives, and their spouses, and even the way it's affected them as adults in dealing with a marriage relationship and their sexuality, and those sorts of things.

They were allowed literally to beat up on me with a rubber bat that they have down there while they were screaming how much they hated me and the terrible things that were going on, to work on my awareness and understanding of that circumstance.

A flip side of that might be in individual when he worked on something that's bothered me for years that I have never put a label on of why don't you love me and why don't you care about me, and the way it

goes back to childhood, and a feeling that I had with my mother and the fact that she didn't have time for me, and how I could have that feeling as an adult. In group that night we worked on that, and the same victims that a few weeks before had beat on me gave me hugs and said that they accepted me.

One of the real benefits of the group is the destruction of the denial mechanisms in working with other offenders and victims both. Some of the denials are really strong. One is I had trouble seeing myself as abnormal in my preference to be around children rather than adults. And the way that they worked on that and showed me how dysfunctional and abnormal it was a good example, it's hard to explain these things.

Other parts of therapy consist of stimulus secession therapy. Are you familiar with that at all? I'd rather not explain it.

THE COURT: Feel free to explain anything you want.

DEFENDANT: Are you familiar with it?

THE COURT: I'd just as soon be the one that asks the questions.

DEFENDANT: I'm sorry?

THE COURT: Let's not get into a back and forth here. This is your right to address the court.

DEFENDANT: It's an aversion technique consisting of a specific way to masturbate so that you avert yourself to a sexual attraction to children.

I keep a journal and work on a journal. Dr. Card often gives me homework to do during the week. Some of it has been autobiographical, extensive chronicling of the abuse, and reading fiction like "To Kill a Mocking Bird" or "Color Purple" or something that depicts healthy adult relationships, because I'm not—I have trouble imagining healthy adult relationships.

He has also begun to involve the family in Utah in the therapy. My sister is concerned, let her to go in and talk to Dr. Card. She and her husband to talk to Dr.

Card, and a niece that I abused years ago has been in to talk to Dr. Card. We hope to involve the family in another group, the family consisting of JoAnn and Bob, my sister and brother-in-law, the niece, brother Dave down there, and myself, because at first when I went down to Utah I thought that the family was exceedingly healthy and that they would be a large support in that area. I have discovered that there is some human type dysfunction in the family and that my relationship with my sister, who is 16 years my senior, is much like the dysfunctional relationship that I had with my mother.

Dr. Card believes that by involving the family and involving my sister, and the victim that was a niece, and working in a group setting with that group, that I have a great opportunity to re-establish an adult healthy relationship with my sister and gain a lot of learning from that.

As far as future therapy goes, Dr. Card is going to be into stress reduction as soon as matters in this area in Idaho are settled. Continued testing, as Mr. Wiebe has talked about, including plethysmograph to help gauge my attraction to children.

I don't have memories of childhood before the age of nine, and he wants to begin extensive hypnosis and investigate my life from awareness through age nine and find out more about what was happening back in that period of my life. He also has a method that utilizes hypnosis in individual therapy to effectively re-parent myself through using—I wouldn't want to be quoted on this—but it's using the superego to parent the ego through hypnotic suggestion and some things like that, once I get further into treatment have better success or feel better about myself so that he can work on the self-image problem.

I know that these things are in store, and I know that he has another one that I will have to go through is a videotaping of a hypothetical encounter or grooming and cruising for a victim that would be shown in group and picked apart.

Dr. Card has a lot of techniques for dealing with this problem, but the number

one thing is that there is a criminal behavior and there is a personal dysfunction that needs to be addressed more than the criminal behavior because if the personal dysfunction was not there, then the criminal behavior would not occur.

Tr., Sentencing, 34–45.