# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 44445-2016

STATE OF IDAHO,

      Plaintiff-Respondent,

v.

PATRICK JAMES BAILEY,

      Defendant-Appellant.

Boise, February 2017 Term

2017 Opinion No. 28

Filed: April 10, 2017

Stephen W. Kenyon, Clerk

Appeal from the District Court of the First Judicial District of the State of Idaho, in and for Kootenai County. Hon. John T. Mitchell, District Judge.

The judgment of the district court is affirmed.

Erik R. Lehtinen, Deputy State Appellate Public Defender, Boise, argued for appellant.

Kenneth K. Jorgensen, Deputy Attorney General, Boise, argued for respondent.

EISMANN, Justice.

This is an appeal out of Kootenai County from the sentence of life in the custody of the Idaho Board of Correction for the crime of committing lewd conduct upon the Defendant's ten-year-old daughter, who was so severely impaired by autism that she could not speak a full sentence or describe anything that had happened to her. We affirm the judgment of the district court.

## I.

### Factual Background.

On October 26, 2014, the mother ("Mother") of a severely autistic, ten-year-old daughter came home and discovered Patrick Bailey ("Defendant"), the man with whom she had been living with for seventeen years, lying on top of their daughter ("Daughter") in the master bedroom and "rubbing his penis against her vagina and midsection area in a thrusting-sexual type motion." He had his pants undone and partially lowered, was kissing her all over her neck, was

trying to wrap her leg around his waist, and was trying to hold her arm down as she was wriggling and trying to get out from under him. Daughter was dressed in pajama shorts and a short top. Her autism was so severe that she was unable to communicate verbally or with sign language, wore a diaper, and was unable to care for herself. During the proceedings, Defendant admitted to sexually molesting her four prior times when Mother and their son were out of the house.

Defendant ultimately pled guilty to one count of lewd conduct with a minor under sixteen years of age. The district court held a sentencing hearing on March 31, 2015, at which it sentenced him to life in the custody of the Idaho Board of Correction, with seven years fixed and the balance indeterminate. Defendant filed a motion pursuant to Idaho Criminal Rule 35(b) seeking a reduction in his sentence, and the court held a hearing on that motion on July 29, 2015. After considering the additional evidence offered by Defendant and the arguments of the parties, the court denied the motion. Defendant then timely appealed.

## II.

### Did the District Court Abuse Its Discretion in Imposing the Sentence?

Defendant contends that the district court abused its discretion in imposing the sentence. "When considering whether the trial court abused its discretion, this Court considers: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the boundaries of its discretion and consistently with the legal standards applicable; and (3) whether the trial court reached its decision by an exercise of reason." *State v. McIntosh*, 160 Idaho 1, 8, 368 P.3d 621, 628 (2016). To reach a decision by an exercise of reason, the court must take into consideration "'the facts and circumstances which are necessary to make *a sound, fair, and just determination,* and a knowledge of the facts upon which the discretion may properly operate.'" *State v. Hooper*, 119 Idaho 606, 611, 809 P.2d 467, 472 (1991).

### A. Did the District Court Base Its Sentence Upon Erroneous Factual Findings?

Defendant first argues that the district court abused its discretion by basing its decision on clearly erroneous factual findings. Each allegedly erroneous finding will be addressed below.

**1. Did the district court erroneously conclude that Defendant lied about passing out immediately after the incident?** Defendant contends that the district court erred when it found

that he "lied about passing out *immediately* after the incident." (Emphasis added.) The presentence report included a verbatim account of Defendant's version of what occurred with respect to the crime to which he pled guilty. His version included the statement that after Mother caught him on top of Daughter, "I lifted myself off of [her], laid down and passed out." The significance of this statement was to show that he was so intoxicated when he committed the offense that he passed out immediately after being caught. At the sentencing hearing, the district court stated, "I have to tell you that I don't believe that that's what happened, that you got up and passed out." Defendant contends on appeal that the court's statement was clearly erroneous.

The police report records Mother as recounting that she and Defendant had coffee at about 9:00 a.m.; that their son was not home because he had stayed the night with a friend; that around 10:00 a.m. Defendant left to run an errand and returned about 10:30 a.m., when he began to drink beer; that Mother left home at about 2:00 p.m. to run some errands; and that she returned home at about 3:00 p.m. and discovered Defendant sexually molesting Daughter. She testified at the sentencing hearing that when she caught Defendant on top of Daughter, he did not seem to be intoxicated. On cross-examination, she testified that she saw Defendant purchase two beers and complete drinking one before she left to run the errands. They were 24-ounce beers with about 8% alcohol content. On redirect examination, she explained that he started drinking that brand of beer in 2007, that during the ensuing years his tolerance for alcohol increased, and that by the time of the incident he had to drink three or four of them before she could see it in his face.

Defendant contends on appeal that it was undisputed that he passed out immediately after he was caught because even Mother "told the investigating officer that, 'After checking [Daughter] out, [Mother] went upstairs to find Patrick passed out snoring on the bed. For the majority of the remainder of the day, Patrick was mostly sleeping.' " This statement ignores Mother's testimony at the sentencing hearing. She testified that after discovering Defendant molesting Daughter, she took their daughter downstairs, checked her out from head to toe, and took her diaper off and checked her. She then had her try on a new coat and shirt that she had just purchased for her, and they watched a movie. After the movie was over, Mother went upstairs and found Defendant lying on the couch. Mother did not testify as to the amount of time that had elapsed between taking Daughter downstairs and returning upstairs to see Defendant lying on the couch, but it was clearly not immediately after he got off their daughter. The district court found Mother's testimony credible. It stated, "[Y]ou discuss alcohol, and your version of

the events on Page 4 of the PSI does nothing to discredit your wife's testimony that in her opinion you were not intoxicated on the day in question."[1]

**2. Did the district court erroneously find that Defendant groomed Daughter and engaged in predatory behavior?** During the sentencing hearing, the district court stated that Defendant's conduct was predatory. In context, the court said:

> The common thread on Page 4 of the PSI [presentence report] and at Page 9 of the events in question and 10 on the other four incidents is that it's always when your wife and your son are away from the house, and that is beyond mathematical chance of being non-grooming, non-predatory behavior . . . .
> . . . .
> [E]ven if there were evidence of that [only four other instances of molesting his daughter], it's still predatory; it's at best opportunistic but still premeditated. You're waiting every time until your wife and your son leave so that you can do these horrible things to [Daughter]. It's that plain and simple. None of this is happening by happenstance. You don't find yourself drunk with [Daughter] and you don't realize that your wife and your son are gone. This is all premeditated on your part every single time . . . .

Black's Law Dictionary defines a "predatory crime" as "[a] crime that involves preying on and victimizing individuals. • Examples include robbery, rape, and carjacking." Black's Law Dictionary 453 (10th ed. 2014). Under that definition, Defendant's conduct was certainly predatory. Defendant contends that we should view the district court's comments as using a definition of "predatory" that was deleted from a statute in 2011. Defendant does not present any logical argument as to why the district court would have intended a statutory definition that was deleted years earlier. As recorded in the police report, after being arrested Defendant told the investigating officer that he had molested Daughter four prior times. The officer recorded Defendant as stating, "Each of these four times occurred on Friday evenings while [Mother] was at Bingo and [their son] was at a friend's house for a sleep over." It is clear from the context that the court was focused upon the fact that Defendant had planned the sexual molestation of his daughter each of the times he reportedly molested her, which is consistent with the definition of predatory in Black's Law Dictionary.

Defendant points out that the expert who performed the psychosexual evaluation of Defendant described the offense as "opportunistic" and testified that Defendant "found his

---

[1] The district court repeatedly incorrectly referred to Mother as Defendant's wife. They lived together and had two children, but were never married.

opportunity in time because he was her caregiver." Defendant argues that it was clear from the expert's testimony at the hearing on the motion for reduction of sentence that he "was obviously distinguishing this 'opportunistic' behavior from 'predatory' behavior—where the offender actively seeks out sexual victims and often 'grooms,' *i.e.,* manipulates, them into submitting to sexual contact." This argument misstates the facts. The expert was not distinguishing opportunistic behavior from predatory behavior.

During the hearing on the motion for reduction of sentence, defense counsel asked the expert, "Given that conversation you just had about those two types of offenders, where do you think Mr. Bailey falls?" The expert answered, "Due to historical facts, criminal history and the relationship he had to the victim, I viewed it as more of an opportunistic situation because the way it was set up and while he found his opportunity in time because he was her care giver." The two types of offenders to which the question referred were an opportunistic offender and an impulsive offender, not an opportunistic offender and a predatory offender. The line of questioning began with defense counsel stating, "Counsel asked you about impulsive versus opportunistic, and I think you got cut off as you were distinguishing the two in terms of offense behavior." There was no mention of a predatory offender in the questions asked the expert or in his responses.

The expert testified that the difference between an opportunistic offender and an impulsive offender was that the opportunistic offender weighs the probability of being caught while the impulsive offender does not. He wrote in the psychosexual evaluation report: "It is most likely [Defendant] viewed the situation as opportunistic and estimated the probability of being caught as low. Although he indicated the offense was somewhat impulsive, he generally doesn't present as an individual that would not consider the potential consequences of his actions." The expert also wrote: "Mr. Bailey stated he did not believe he would be caught sexually acting out on his daughter. This appears to be in line with his opportunistic orientation."

With respect to whether there was "grooming," the expert testified that he "didn't have any specific evidence to say that it was a pattern." He added that "based on the victim's behavioral responses, and you know, one can make that assumption, but in the end I try to avoid making the assumption and just go with what the evidence shows." In response to a follow-up question asking whether the lack of specific evidence is why he did not "determine that there was

grooming-specific type behaviors here?" the expert responded: "Correct. In the treatment setting that would be further explored, and if that was applicable then that—you know, that would be addressed as a dynamic risk in the course of treatment." Thus, the expert did not say that Defendant had not engaged in grooming behavior with respect to his daughter. He stated that the facts of which he was aware did not show grooming, although one could assume there was grooming, but whether or not there was would be further explored in a treatment setting. Defendant has not shown any factual error in the district court's comments regarding grooming and predatory behavior.

**3. Did the district court err by implicitly finding that Defendant had molested Daughter more than five times?** Defendant contends that the district court erred in implicitly finding that Defendant molested Daughter more than five times. Defendant underwent a polygraph examination prior to sentencing, but the scope of the examination was limited to whether there were other victims. The examination did not delve into anything regarding his molestation of Daughter. During the sentencing hearing, the court stated:

> Again, I think I've already mentioned the full disclosure polygraph never talks about—never tests to see whether there was only five events, and since [Daughter] can't talk, I have no way of knowing whether there was more than five events.
> . . . .
> You've admitted to five. There is nothing that would convince me that there was only five . . . .

During the hearing on Defendant's motion for a reduction in sentence, the district court stated: "These five events took place over the course of a year and two days . . . . I don't know if there's more. We don't have a psycho—or a full disclosure polygraph."

Defendant argues on appeal that to the extent the district court found that he sexually molested Daughter more than five times, its finding is clearly erroneous. There is no showing that the court did find that Defendant had molested Daughter more than five times, or that the court based its sentencing decision upon such a finding. From Defendant's accounts of the other four molestations, one could certainly suspect that there were more than four other molestations.

Defendant gave two accounts of the additional four times that he had molested Daughter. The first account was during his police interview after his arrest. As recorded in the police report, the other four molestations were as follows:

The previous four other incidents occurred inside [Daughter's] bedroom on top of her bed while both [Mother] and [their son] were not at the residence. Each of these four times occurred on Friday evenings while [Mother] was at Bingo and [their son] was at a friend's house for a sleep over.

Three of the incidents Patrick had [Daughter] rub his penis using her hand on the outside of the clothing while the two of them were on top of her bed. The remaining incident occurred with [Daughter] sitting on top of Patrick rubbing her vagina against his penis as the two of them were on top of [her] bed. During all four incidents, Patrick claimed the two of them were clothed.

Defendant gave the second account as part of the psychosexual evaluation. The evaluator recorded it as follows:

Mr. Bailey stated he first sexually offended his daughter (9 years old) in the Fall of 2013. He stated they were "taking a nap on the couch and [Mother] was at Bingo and [their son] was at a friend's house." He stated he awoke with an erection and "cuddled for a while and I realized it felt good." It was his belief she was unaware of his actions due to her sleeping. He stated she soon awoke and went to her room and watched a movie.

Approximately five weeks later, Mr. Bailey went upstairs of the residence to change the victim's diaper and put her into her pajamas. He stated he went to his room and changed into his pajamas and returned to her room to watch a movie with her. He stated she sat in his lap and she is typically "figgity" in nature, and he developed an erection to her movements. He noted the duration of time she was sitting on his lap was "only minutes." He stated she got up and fast forwarded the movie and did not return to his lap.

He noted the third incident occurred in the victim's room. He noted they were alone in the residence. He stated he was aroused prior to entering her room, and he "checked her diaper and she was ok. I wanted to cuddle with her and I had her sit on my lap." He stated this occurred for a duration of a few minutes. He stated she got up and did not return to lie on his lap.

Mr. Bailey stated on the fourth incident he exposed his erect penis to the victim. He stated there was a "month" duration between the third and fourth incident. He stated it occurred in his bedroom, and he was watching a pornographic movie, and "I was getting ready to masturbate, and she came into the room." He stated she sat by him "and she was curious and she touched the knob of my penis." He stated this occurred for several minutes and she left the room. He stated it was this experience in which "I felt really bad what I did."

Defendant's first account of the four other molestations simply does not match his second account. In his first account, all of the other four molestations occurred in Daughter's bedroom with them on her bed. In his second account, the first and fourth molestations clearly did not occur in her room. In his first account, three of the molestations were him having Daughter rub his penis with her hand through his clothing. In his second account, only one of the molestations

consisted of her touching his penis, and it was not through his clothing. Because Defendant's two accounts do not match, one could suspect that his first account of the four other incidents and his second account of four other incidents were not describing the same incidents. They were describing three or four other incidents.

**4. Did the district court err by implicitly finding that there was no hope of Defendant being rehabilitated in society?** In the psychosexual evaluation report, the evaluator wrote, "Regardless of his future placement (incarceration vs. Community), he would be amenable to sex offender treatment; however, compliance with the rules and substance abuse relapse are precursors to problematic behaviors." During the sentencing hearing, the district court stated: "None of this is happening by happenstance. . . . This is all premeditated on your part every single time, and that's why I don't think there is any hope of rehabilitating you in society." Defendant contends that the district court erred in stating that Defendant could not be rehabilitated in society and that the court implicitly reaffirmed that erroneous statement during the hearing on the motion for reduction of sentence.

The psychosexual evaluator testified during the motion hearing. Near the end of the hearing as the district court was addressing the objectives of criminal sentencing, it stated: "And your rehabilitation is a factor, and I believe that you are amenable to treatment. . . . [B]ut your being amenable to treatment is something that should inure to your favor seven years from now at your first parole commission hearing." Defendant does not contend that the district court was referring to treatment in prison prior to the parole hearing as opposed to treatment in the community while Defendant was on parole. In fact, on appeal Defendant does not mention this statement by the district court.

**5. Did the district court err by finding that the evaluative tools were completely wrong?** In the psychosexual examination report, the examiner wrote that he had administered to Defendant the Static-99R and the Stable 2007, which are actuarial rating instruments that provide a numerical risk score. The examiner concluded:

> **Estimated Risk Classification:**
> Mr. Bailey was assessed with Static-99R and the Stable 2007. These actuarial measures provide an estimated numerical risk to sexual recidivism. When combining both actuarial measures, Mr. Bailey is categorized as a **Moderate-Low** risk for sexual recidivism. The Static-99R indicated he was low and the Stable 2007 indicated he was in the high risk category.

The evaluator also wrote: "If Mr. Bailey resumes some of the maladaptive aspects of his prior lifestyle, he would naturally aggravate his level of risk. The maladaptive aspects would include: sexual preoccupation, substance abuse dependency, impulsivity and antisocial orientation. It is generally in dysfunctional maladaptive environments in which offenders choose to sexually offend."

At the sentencing hearing, the district court went through each of the five instances of the Defendant sexually molesting Daughter as set forth in the psychosexual evaluation; told Defendant that he did not believe that alcohol was an excuse; that Defendant's molestation was planned and premeditated; and that the court did not believe there were only five incidents. The court then stated: "I think the evaluative tools are completely wrong, and even if I felt that they were right, that you were a moderate to low risk to reoffend, I go back to the events in question. You need to be punished."

At the hearing on the motion for a reduction of the sentence, the psychosexual evaluator testified, regarding the risk assessment based upon the actuarial instruments, that "the probability is less than flipping a coin versus the actuarial measures being at 70 percent in accuracy." The evaluator also explained that under the Static-99R instrument, the four prior molestations admitted by Defendant were not counted because the instrument only takes into account prior criminal charges or convictions, not the number of times the person has offended. When asked what the score would have been had the four other molestations been convictions, the evaluator stated that Defendant would be in the moderate-high risk category. The court ultimately concluded that the punishment must fit the crime, and it denied the motion for reduction of sentence.

"The objectives of criminal punishment are protection of society, deterrence of the individual and the public, possibility of rehabilitation, and punishment or retribution for wrongdoing, with the primary objective being the protection of society." *State v. Jimenez*, 160 Idaho 540, 544, 376 P.3d 744, 748 (2016). The district court has the discretion to weigh those objectives and give them differing weights when deciding upon the sentence. *McIntosh*, 160 Idaho at 9, 368 P.3d at 629; *State v. Moore*, 131 Idaho 814, 825, 965 P.2d 174, 185 (1998) (court did not abuse its discretion in concluding that the objectives of punishment, deterrence and protection of society outweighed the need for rehabilitation). The court's decision that punishment was the most important objective was not a factual error.

9

**B. Did the District Court Abuse Its Discretion in Sentencing?**

Defendant contends that the district court abused its discretion in imposing the sentence and abused its discretion in failing to grant the motion seeking a reduction in that sentence. We will only consider the denial of the Rule 35(b) motion seeking a reduction in Defendant's sentence. He presented additional evidence during the hearing on that motion. If we agree that the court abused its discretion in denying that motion, then there would be no reason to consider whether the court abused its discretion when it initially imposed the sentence. If we affirm the denial of the Rule 35(b) motion, then the issue of whether the sentence was an abuse of discretion would be moot. "Thus, in those cases where only the reasonableness of a sentence is being challenged, an appeal from a sentence and an appeal from a Rule 35 motion are essentially the same." *State v. Alberts*, 124 Idaho 489, 490, 861 P.2d 59, 60 (1993).

When considering whether the district court abused its sentencing discretion, we review the entire sentence, but we presume that the defendant's term of confinement will probably be the fixed portion of the sentence, because whether or not the defendant's incarceration extends beyond the fixed portion of the sentence will be within the sole discretion of the parole board. *State v. Oliver*, 144 Idaho 722, 726, 170 P.3d 387, 391 (2007). Our standard of review is as follows:

> When a trial court exercises its discretion in sentencing, "the most fundamental requirement is reasonableness." A sentence is reasonable if it appears necessary to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation, or retribution. When reviewing the reasonableness of a sentence, this Court conducts an independent review of the record, giving consideration to the nature of the offense, the character of the offender and the protection of the public interest. "In deference to the trial judge, this Court will not substitute its view of a reasonable sentence where reasonable minds might differ." Furthermore, "[a] sentence fixed within the limits prescribed by the statute will ordinarily not be considered an abuse of discretion by the trial court."

*McIntosh*, 160 Idaho at 8, 368 P.3d at 628 (citations omitted).

Defendant pled guilty to lewd conduct with a child under sixteen, and the maximum period of incarceration for that offense is life in the custody of the Idaho Board of Correction. I.C. § 18-1508. Thus, the sentence was within the limits prescribed by statute.

At the sentencing hearing, the State recommended a sentence of thirty years in the custody of the Idaho Board of Correction, with fifteen years fixed and the balance indeterminate.

The defense requested that the court retain jurisdiction for 365 days, during which time Defendant could be evaluated and treated by the Department of Corrections and could have an opportunity to prove to the court that he should be placed on probation. Inherent in that request was that Defendant be sentenced to prison, but the defense did not suggest an underlying sentence.[2]

The district court sentenced Defendant to life in the custody of the Idaho Board of Correction, with seven years fixed and the balance indeterminate, and it refused to retain jurisdiction. In explaining the reason for that sentence, the court began by stating that the nature of the crime mandated a prison sentence. The court focused upon the facts that Defendant sexually abused Daughter multiple times, that alcohol was not a factor, that the abuse was premeditated, that she was incapable of resisting, and that Daughter's actions indicated that the abuse had a profound impact upon her. The court concluded by stating that Defendant needed the seven years fixed as punishment, and also for the protection of society, deterrence to others, and deterrence to Defendant.

Defendant filed a timely motion seeking a reduction of his sentence pursuant to Rule 35(b) of the Idaho Criminal Rules. He did not challenge the underlying sentence, but again requested that the district court retain jurisdiction. In support of that motion, Defendant had the psychosexual evaluator testify regarding his report, including correcting an error made by the polygraph examiner that there had been an unadjudicated male victim.

At the conclusion of the hearing, the district court stated that the paramount factor in sentencing was the protection of society, which in most cases could be accomplished through rehabilitation of the defendant. However, the court stated that in this case deterrence and punishment were more important. The court reiterated that alcohol was not a factor in the abuse and that Defendant "chose a victim that was incapable of resisting, that was incapable of telling

---

[2] Pursuant to Idaho Code section 19-2601(4), a district court may suspend execution of the judgment of conviction and retain jurisdiction for 365 days. During that period, the Department of Correction assesses the defendant to determine his or her needs and places the defendant at an appropriate prison facility to receive intensive programming and education. The Department can also assess the defendant's attitude and willingness to abide by required rules. Near the end of the period of retained jurisdiction, the Department submits a report to the sentencing court regarding the defendant's performance while in its custody and the Department's recommendation regarding whether to suspend the sentence and place the defendant on probation. That recommendation is purely advisory and is not binding upon the court.

11

anybody, and the only reason that you were caught was because your wife caught you, walked in." The court denied the motion for reduction of Defendant's sentence.

On appeal, Defendant does not challenge the fixed portion of his sentence. He only challenges the indeterminate life sentence and the refusal to retain jurisdiction. He contends that the district court abused its discretion in this regard for four reasons.

First, Defendant asserts that the district court lost perspective and suggested "that Mr. Bailey's crime was worse than a cold-blooded murder; however, as bad as it was, his crime was not on par with a murder." This misstates the record. The court did not state that the crime was on par with or worse than murder. During the hearing on the motion for reduction of sentence, the court stated, "I think it would be easier for me to have sentenced somebody who killed somebody in cold blood."

Second, Defendant states that his conduct could have been worse. He asserts: "Further, while Mr. Bailey's sexual contact with [Daughter] cannot be minimized, the fact is that the contact itself was not the worst of the worst. There is no evidence of any sexual penetration, and, while five instances of sexual contact is five times too many, this was not a case where the abuse was constant over a period of years or even a lifetime."

Third, Defendant argues that there are compelling mitigating circumstances, which he lists as follows:

> Mr. Bailey has an excellent work history and is highly valued by his most recent employer. He has also demonstrated the ability to form close interpersonal relationships which keep him grounded. Finally, and most importantly, as discussed above, Mr. Bailey had a very positive psychosexual evaluation. Based on a polygraph examination, it was confirmed that he had no other victims. He was not diagnosed as suffering from pedophilia. It was noted that he recognized the wrongfulness of his actions and was remorseful. It was determined that that Mr. Bailey presents a "moderate-low" risk of recidivism. And it was ascertained that Mr. Bailey is "an appropriate candidate for treatment."

He concludes, "When all of these mitigating circumstances are weighed against the circumstances of the offense, it cannot be said that a life sentence represents a reasoned sentencing determination."

The district court took into account the facts of the abuse and the asserted mitigating factors. It also took into account the extreme vulnerability of Daughter. At the sentencing

hearing, Mother testified regarding Daughter's level of impairment resulting from her autism as follows:

> Q. Can you describe to the judge her level of impairment, please?
> A. . . . . She would not be able to make her own breakfast or lunch. She would not be able to use a bathroom by herself without help. Getting herself dressed she does on occasion but not often. Uh, her speech, no. Uh, she comes up to you basically and takes you by your hand to the refrigerator or for food or outside but not for anything else. She doesn't—she says a few words here and there.
> Q. She can't say a full sentence, for instance?
> A. No. She cannot say a full sentence to me. She cannot tell me when she's upset or her stomach hurts or anything.
> Q. Can she describe to you if something has happened to her?
> A. No, she could not.
> Q. Can she describe to anyone whether or not something's happened to her?
> A. No, she could not.
> Q. Does she wear a diaper?
> A. Yes, she does.
> Q. Can she pour her own glass of juice?
> A. No.

Finally, Defendant argues that Daughter has a chance to be happy and thrive. He asserts: "[Daughter] is alive and has her whole life ahead of her. And, while she may very well suffer deep emotional scars (especially given her disability, which will undoubtedly make therapy more difficult), she has a chance to be happy and to thrive."

The district court also took into account the impact of Defendant's conduct on Daughter. Mother testified to changes in Daughter she had witnessed as follows:

> A. Some of the changes, well, um, she shut down for a while as far as letting anybody near her except for me. Um, she often wakes up out of a dead sleep crying, um, for hours, hysterical. Um, there's times I am not able to change her diaper or get her ready for bed. Uh, she gets physical. Uh, she got so physical in February that she kicked me in the middle of the chest and knocked me backwards just trying to change her pants from one pair to another pair. Um, she's been very aggressive towards our pets as far as kicking them. She tried to stab one today. Um, she's out lashed at, um—sorry. She's lashed out at everybody in the house pretty much. She gets mad and breaks things, her brother's stuff, purposely, which she's done in the past, but it's more intense now when she gets angry because I think she's frustrated because she can't communicate.
>
> The meltdowns are the worst because you don't know when they're coming. One minute she's laughing and singing, and the next minute she's crying for two hours, and you can't calm her down because you don't know what to do.

13

There was absolutely no excuse or justification for Defendant's sexual molestations of Daughter. The district court determined that the sentencing objectives of punishment and deterrence outweighed the goal of rehabilitation. Defendant concludes his argument by stating: "Thus, if the life sentence was not objectively unreasonable at the time of the original sentencing hearing, it certainly was by the time the district court denied the Rule 35 motion. Accordingly, the decision to deny the Rule 35 motion represented an abuse of discretion as well."

Defendant did not challenge his underlying sentence in connection with his motion pursuant to Rule 35(b). He only challenged the refusal of the district court to retain jurisdiction for 365 days to keep open the possibility of a suspended sentence and probation. The district court stated that it would not retain jurisdiction in a case where it was not considering probation as a possibility at the end of the retained jurisdiction. The court adhered to its belief that punishment and deterrence were the overriding factors in this case. "When a court reasonably determines that other sentencing objectives outweigh the goal of rehabilitation, the court does not abuse its discretion in denying a motion for leniency under Rule 35." *Moore*, 131 Idaho at 825, 965 P.2d at 185.

On appeal, Defendant challenges only his indeterminate life sentence. He does not challenge the fixed portion of his sentence. Although we consider his entire sentence, we do not presume that he will serve more than the fixed portion of his sentence. Although he asserts that the indeterminate life sentence was unreasonable, he has not presented any argument or authority on appeal as to why it is unreasonable.

## III.
### Conclusion.

We affirm the judgment of the district court.


Chief Justice BURDICK, and Justices JONES, HORTON and BRODY **CONCUR.**

14